Clara **GOLDENBERG**, formerly Clara Littman, Appellant,

v.

**BACHE AND COMPANY**, Appellee.

**BACHE AND COMPANY**, Appellant,

v.

Clara **GOLDENBERG**, formerly Clara Littman, Appellee.

No. 17305.

United States Court of Appeals Fifth Circuit.

Sept. 30, 1959.

Albert L. Weintraub, Miami, Fla., Richard J. Stull, New York City, for appellants.

Kenneth B. Sherouse, Jr., Miami, Fla., Fowler, White, Gillen, Yancey & Humkey, Miami, Fla., of counsel, for appellees.

Before RIVES, Chief Judge, and TUTTLE, Circuit Judge, and SIMPSON, District Judge.

RIVES, Chief Judge.

This action was brought in the Southern District of New York by Mrs. Goldenberg, a citizen of Florida, against Bache and Company, a New York copartnership and member of the New York Stock Exchange. Bache and Company filed an answer and counterclaim against Mrs. Goldenberg. The action was transferred from the Southern District of New York to the Southern District of Florida.[1]

The facts were stipulated. The district court, after recapitulating the agreed facts, stated its conclusions of law, and entered judgment for the defendant on the original complaint and judgment for the plaintiff on the defendant's counterclaim.

The complaint is based upon the duties owed by a stockbroker to his customer under the Securities Exchange Act of 1934, as amended,[2] and Regulation T of

1. Under 28 U.S.C.A. § 1404(a).

2. The following provisions are particularly pertinent: Title 15 U.S.C.A. § 78g(c) provides:

"(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer who transacts a business in securities through the medium of any such member, directly or indirectly to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

"(1) On any security (other than an exempted security) registered on a national securities exchange, in contravention of the rules and regulations which the Board of Governors of the Federal Reserve Sys-

the Federal Reserve Board, Title 12, C.F.R., Part 220.[3] The "Customer's Margin Agreement" with the defendant broker, dated January 20, 1955, provided:

"11. All transactions for my account * * * shall be subject to the constitution, rules, regulations, customs and usages from time to time in effect of the Exchange or Board or market and its clearing house, if any, * * * to the present and future provisions of the Securities Exchange Act of 1934,

tem shall prescribe under subsection (a) and (b) of this section.

"(2) Without collateral or on any collateral other than exempted securities and/or securities registered upon a national securities exchange, except in accordance with such rules and regulations as the Board of Governors of the Federal Reserve System may prescribe * * *."

Title 15 U.S.C.A. § 78g(d) provides:

"(d) It shall be unlawful for any person not subject to subsection (c) of this section to extend or maintain credit * * for the purpose of purchasing * * * any security registered on a national securities exchange, in contravention of such rules and regulations as the Board of Governors of the Federal Reserve System shall prescribe * * *."

Title 15 U.S.C.A. § 78o(c)(1) provides:

"(c) (1) No broker or dealer shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this subsection, by rules and regulations define such devices or contrivances as are manipulative, deceptive, or otherwise fraudulent."

Title 15 U.S.C.A. § 78aa provides:

"The district courts of the United States * * * shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter * * *."

Title 15 U.S.C.A. § 78bb(a) provides:

"(a) The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity * * *."

Title 15 U.S.C.A. § 78cc provides:

"(a) Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

"(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation: *Provided*, (A) * * *, and (B) that no contract shall be deemed to be void by reason of this subsection in any action maintained in reliance upon this subsection, by any person to or for whom any broker or dealer sells, or from or for whom any broker or dealer purchases, a security in violation of any rule or regulation prescribed pursuant to paragraph (1) of subsection (c) of section 78o of this title, unless such action is brought within one year after the discovery that such sale or purchase involves such violation and within three years after such violation.

"(c) Nothing in this chapter shall be construed (1) to affect the validity of any loan or extension of credit * * * unless at the time of the making of such loan or extension of credit (or extension or renewal thereof) * * * the person making such loan or extension of credit (or extension or renewal thereof) * * shall have actual knowledge of facts by reason of which the making of such loan or extension of credit (or extension or renewal thereof) * * * is a violation of the provisions of this chapter or any rule or regulation thereunder * * *."

3. The following was stipulated:

" * * * At the beginning of the period in question in 1955 a supplement to this regulation provided:

" 'The maximum loan value of a registered security (other than an exempted

\* \* \* and of all other laws applicable thereto, and to the rules and regulations of administrative bodies that may have jurisdiction thereunder \* \* \*."

On April 5, 1955, Bache and Company held for the account of the then Mrs. Littman $5,550.66, upon which it received and executed a purchase order for her account on margin of 1,000 shares of Continental Motors at 13⅛, that is $13,125 (the total including commissions and taxes was $13,306.30). Subsequent dealings are recounted in the parts of the stipulation quoted in the margin.[4]

The judgments for the defendant and for the cross-defendant were based upon the following conclusions of law:

"2. The provisions of 15 U.S. C. [§] 78cc(b) provides that every

security) in a general account, subject to Section 3(d) (3) of Regulation T, shall be 40 per cent of its current market value.' See 20 Federal Register 177 (January 7, 1955).

"In short, it was necessary for the customer to put up 60 per cent of the value of the stock as an equity to make the initial purchase prior to 23 April 1955, at which time the regulation was amended to permit a loan of only 30 per cent of the current market value of the stock, thus requiring the customer to have an equity of 70 per cent in the stock as a purchase margin. This latter percentage schedule is still in force.

"During the period in question, the applicable New York Stock Exchange margin maintenance requirements were 25 per cent. This was the minimum margin required to maintain an account after the purchase under the rules and regulations of the New York Stock Exchange."

Other pertinent provisions of Regulation T were:

"(b) General rule—(1) A creditor shall not effect for or with any customer in a general account any transaction which, in combination with the other transactions effected in the account on the same day, creates an excess of the adjusted debit balance of the account over the maximum loan value of the securities in the account, or increases any such excess, unless in connection therewith the creditor obtains, as promptly as possible and in any event before the expiration of three full business days following the date of such transaction, the deposit into the account of cash or securities in such amount that the cash deposited plus the maximum loan value of the securities deposited equals or exceeds the excess so created or the increase so caused." 11 C.F.R. 220.3(b) (1).

"A creditor may permit interest, dividends or other distributions received by the creditor with respect to securities in a general account to be withdrawn from the account only on condition that the adjusted debit balance of the account does not exceed the maximum loan value of the securities in the account after such withdrawal \* \* \*." 12 C.F.R. 220.6 (g) (2).

*Innocent Mistakes*—If any failure to comply with this regulation results from a mistake made in good faith in executing a transaction, recording, determining, or calculating any loan, balance, market price or loan value, or other similar matter, the creditor shall not be deemed guilty of a violation of this part if promptly after the discovery of the mistake he takes whatever action may be practicable in the circumstances to remedy the mistake." 12 C.F.R. 220.6(g) (2) (k).

4. "16. On 7 April 1955, a telegram was sent from Bache's New York office to the Miami Beach office of Bache & Company requesting an additional deposit of $2,396.00 because of need to bring the account up to the required margin.

"17. On 14 April 1955, Mr. Joseph Littman, husband of Mrs. Clara Littman, wrote a letter to Bache & Company authorizing Bache & Company to transfer $2,396.00 from his account with Bache & Company to Mrs. Littman's account with Bache & Company. Mr. Littman at that time had a similar customer's margin agreement with Bache & Company.

"18. Defendant contends that in reliance upon the authority from Mr. Joseph Littman to transfer funds from his account to Mrs. Littman's account, Bache & Company did not sell-out Mrs. Littman, on the 300 shares of Continental Motors last purchased, although no funds were physically transferred at this time from Mr. Littman's account to Mrs. Littman's account. No funds were physically transferred at this time.

"19. On 29 August 1955, Mrs. Littman ordered an additional 300 shares of Continental Motors. This purchase was settled on 2 September 1955. On 1 September 1955, Mr. Joseph Littman authorized the transfer of $2,600 from his account to Mrs. Littman's account. This transfer

contract made in violation of any provision of Chapter 2B of Title 15, U.S.C., or of any rule or regulation thereunder, the performance of which involves the violation of any provisions of the aforesaid chapter or any rule or regulation thereun-der, shall be void, as regards the rights of any person who, in violation of any such provision, rule or regulation shall have made or engaged in the performance of any such contract. Section 78cc(b) further provides a limitation which ap-

was made and Mrs. Littman's account credited on 3 September 1955.

"20. On 28 November 1955, Mrs. Littman ordered Bache & Company to sell her 1300 shares of Continental Motors.

"21. On 2 December 1955, the above sale of 1300 shares of Continental Motors was settled and the 1300 shares were sold for $11,700.00. (Net $11,491.11.)

"22. Thus, on 2 December 1955, Mrs. Littman had a credit with Bache & Company of $3,149.18.

"23. On 28 Nov. 1955, Mrs. Littman ordered Bache & Company to buy for her 1100 shares of Eltronics.

"24. On 28 November 1955, this sale was settled and the 1100 shares of Eltronics were purchased for Mrs. Littman at a price of $10,587.50. (Net $10,763.-50).

"25. Defendant contends that there is no question that Mrs. Littman's account was adequately margined when she bought the 1100 shares of Eltronics because it was a permissible substitution of collateral, stock for stock plus cash. Under Regulation T. Plaintiff disagrees.

"26. Late in April or early in May of 1956, a margin clerk in the New York office of Bache & Company discovered that Mrs. Littman's account was under-margined because the New York margin clerk had given Mrs. Littman credit for owning 110 shares of Electronics, a stock worth much more than Eltronics.

"27. Thus, in fact, Mrs. Littman's account had been under-margined since 4 January 1956.

\*    \*    \*    \*    \*

"29. On 11 June 1954, Mrs. Littman received written notice from Bache & Company of an impending sell-out for failure to maintain minimum requirements of 25 per cent.

"30. Under the terms of Mrs. Littman's margin contract with Bache & Company no notice of an impending sell-out was required and Bache & Company under the contract, could sell out the customer's account at any time the maintenance margin dropped under 70 per cent although it would not need to do so until the minimum maintenance requirement dropped to 25 per cent equity.

"31. On 15 June 1956, Mrs. Littman's account was liquidated by Bache & Company and her 1100 shares of Eltronics were sold at 4¼, or a total of $4,553.60, and the proceeds were applied to her indebtedness to Bache & Company.

"32. Under Bache's theory of the case, this liquidation left a deficiency of $3,-212.00 which Mrs. Littman owes to Bache & Company, with interest. Bache & Company's counterclaim is based upon recovery of this deficiency owed.

"33. Under plaintiff Goldenberg's theory of the case, plaintiff seeks recovery of $5,200.66 deposited by Mrs. Littman on 5 April 1957 and $2,600.00 deposited in September of 1955, plus $350.00 deposited, for a total of $8,150.66.

"34. It is agreed that plaintiff Clara Littman Goldenberg ordered Eltronics, was properly billed for Eltronics, and that Eltronics was the only stock listed on her monthly statement after she purchased it.

"35. It is agreed that Mrs. Clara Littman Goldenberg received correct monthly statements describing her account and the status thereof during each and every month that she maintained an account with Bache & Company.

"36. It is agreed that the error or confusion between Eltronics and Electronics, with the wide variation in value between the two, committed by a New York margin clerk of Bache & Company, explains the failure to discover the maintenance margin going below minimum requirements from January through to June of 1956.

"37. It is agreed that this error was discovered in approximately April or May of 1956 when a Bache & Company clerk in the New York office checked up on accounts related to the account of Mrs. Joseph Littman, who was then under-margined, in an attempt to determine whether funds could be secured from related accounts to bring Mr. Joseph Littman's account up to the 25 per cent minimum maintenance requirement. At this time, in checking upon Mrs. Littman's account, it was found that she, too, was undermargined."

plies to that Section which states that no contract shall be void unless action is brought within one year after the discovery that such sale or purchase involves such violation and within three years after discovery. As such, the transaction involving the purchase of the Eltronics stock is void unless action is brought within the limitations provided above. Further, the term 'discovery' has been held to require that reasonable diligence be used toward discovering the mistake or fraud involved.

"3. Suit in the above styled case was not brought until March 18, 1957, more than one year subsequent to when both plaintiff and defendant could by reasonable diligence, have discovered the errors in the account. Therefore the limitations provided by the above cited statute bar the plaintiff from proceeding at this time.

"4. Error was committed by defendant Bache and Company in failing to transfer funds to plaintiff's account when authorized to do so by her husband, and was further in error when plaintiff was given credit by the defendant for owning Electronics stock instead of Eltronics. The first error was of the type and kind that is excused under the provisions of Section 6(k), Regulation T-Miscellaneous, 12, C.F.R. Part 220. The second error is not excusable, and had plaintiff's action been brought within the time specified, the plaintiff would have had valid grounds for recovery. On the other hand, the negligence of defendant Bache and Company does not give them a cause of action against the plaintiff. Further, the period of limitations applies equally to both plaintiff and defendant."

This action could be looked on either as an action *ex contractu*, based on the contract between stockbroker and customer as affected by the federal statute and regulations, or as an action *ex delicto*, based upon "federal canon law torts."[5] Whichever may be the better theory, Mrs. Goldenberg seeks to hold Bache and Company responsible for "manipulative, deceptive, or otherwise fraudulent device or contrivance" as defined by the statute, Title 15 U.S.C.A. § 78o(c)(1), and Regulation T, see footnote 2, supra. Granted that violations of the Act or Regulation entered into the sales or purchases of which she complains, yet, before such contracts are "deemed to be void," Mrs. Goldenberg's action must have been brought both within three years after the violation and within one year after its discovery. 15 U.S.C.A. § 78cc(b), quoted in footnote 2, supra.

The claimed violations occurred in April 1955, when 1,000 shares of Continental Motors were purchased for the then Mrs. Littman and when, shortly thereafter, the broker failed to follow her husband's direction to transfer to her $2,396 from his account, and in December 1955 when 1,100 shares of Eltronics were purchased for her. The district court found:

"There is no direct testimony to the effect that the plaintiff had actual communicated knowledge of any violations of the margin requirements, but there is ample evidence of her knowledge of the status of her account and that she was an experienced trader. It is admitted that she received a monthly statement from the defendant, and that it was correctly stated, and that plaintiff was aware at various times of the current market value of her stock. Mr. Lippman (sic), plaintiff's

5. See Remar v. Clayton Securities Corporation, D.C.Mass.1949, 81 F.Supp. 1014, 1017; Smith v. Bear, 2 Cir., 1956, 237 F.2d 79, 88, 60 A.L.R.2d 1119; see also, Northern Trust Co. v. Essaness Theatres Corp., D.C.N.D.Ill.1952, 103 F. Supp. 954, 964; Textron, Inc. v. American Woolen Co., D.C.Mass.1954, 122 F. Supp. 305, 308; Howard v. Furst, S.D. N.Y.1956, 140 F.Supp. 507, 510; Annotations 85 L.Ed. 506; 37 A.L.R.2d 549.

former husband at that time, was active in the buying and selling of stocks, and she had been in the market for some years." [6]

The district court further found:

"Neither plaintiff or defendant used reasonable diligence to ascertain whether plaintiff's account was properly margined."

■ "Discovery" within the meaning of the statute, 15 U.S.C.A. § 78cc (b), quoted in footnote 2, supra, is to be determined, we think, according to an objective standard; that is, "discovery" means either actual knowledge or notice of facts which, in the exercise of due diligence, would have led to actual knowledge of the violation.[7] The district court did not err in holding that both the appellant and the appellee could, by reasonable diligence, have known of the errors in the account more than one year before the action was brought.

■ As to Bache and Company's failure in April 1955, or thereafter, to transfer $2,396 to Mrs. Littman's account from the account of her then husband, the district court held that that was an innocent mistake within the meaning of Section 6(g)(2)(k) of Regulation T, quoted in footnote 3, supra. The failure to make such transfer was apparent in the monthly statements sent to Mrs. Littman, and she raised no objection from April 1955 until her account was liquidated in June 1956. Under such circumstances, we agree with the holding of the district court. Certainly, as was held in Carr v. Warner, D.C.Mass.1955, 137 F.Supp. 611, 615, and in Nash v. J. Arthur Warner & Co., D.C.Mass.1955, 137 F.Supp. 615, 618,

" * * * Even if there had been a breach of duty, which there was

not, plaintiff by repeatedly accepting confirmations and accounts, which fully disclosed all aspects of the transactions, elected not to rely upon that breach. Moreover, by failing seasonably to make complaints of facts of which she was informed, she would in any event be barred from her late assertion of wrong done unto her by the partnership or corporation."

■ As to the counterclaim of Bache and Company, an additional clear answer is that Bache and Company cannot recover from Mrs. Goldenberg any claimed indebtedness resulting from its own violations of the statute and regulation.

The district court properly left the parties where it found them, and its judgments are

Affirmed.

---

Fleischhacker v. Blum, 9 Cir., 1940, 109 F.2d 543, 548; Williamson v. Beardsley, 8 Cir., 1905, 137 F. 467, 470; Blau v. L. Albert & Son, D.C.S.D.N.Y.1957, 157 F.Supp. 816, 818; 12A Words & Phrases, p. 316 et seq., Discovery—Knowledge distinguished; 34 Am.Jur., Limitations of Actions, §§ 164, 165, 230.

---

6. It appears that that finding is based not only on the stipulated facts but on the examination of Mrs. Goldenberg as a witness in the presence of the court. Her testimony is not in the record brought to this Court.

7. See Holmberg v. Armbrecht, 1946, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743;