**AZALEA MEATS, INC., Appellant,**

v.

**Victor MUSCAT and Edward Krock, Appellees.**

No. 23339.

United States Court of Appeals Fifth Circuit.

Nov. 22, 1967.

Hugh L. Black, Jr., Miami, Fla., for appellant.

Earl D. Waldin, Jr., Stanley Jay Bartel, John W. Prunty, Miami, Fla., for appellee.

Before GEWIN and AINSWORTH, Circuit Judges, and LYNNE, District Judge.

LYNNE, District Judge:

Presented on appeal is the narrow question as to whether the district court properly determined, on motion for summary judgment filed in behalf of appel-

lees,[1] that appellant's [2] action, posited upon the provisions of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78j(b)), specifically charging violations of regulation 10b–5 promulgated thereunder,[3] was barred by the Florida statute of limitations. Of the opinion that it did not, we reverse.

Distilled from an abridged, printed record of almost two thousand pages a narrative of the evidentiary contentions contained therein is an aid to a proper perspective. The ensuing synopsis is introduced by a caveat of the gravest importance. We do not essay the role of factfinders nor do we express any opinion as to what issues, if any, should ultimately be submitted to a jury.

Griffith was appellant's president and controlling stockholder. Prior to September 8, 1961, he had participated with Muscat, Huffines and Krock in several business ventures in varying capacities. Griffith and Muscat organized Griffith National Corporation. Huffines joined with Griffith in acquiring Estate Life Insurance Company. Krock, Griffith, Muscat and one A. Alex Shuford, Jr. acquired control of National Bankers Life Insurance Company. Griffith National Corporation became Insurance & Industrial Enterprises, Inc. (I.& I.E.) and thereafter acquired, by an exchange of stock, approximately 77.7 per cent of the common stock of National Bankers Life Insurance Company. The 10,507 shares of I.& I.E acquired by appellant in this exchange had a cost basis to appellant of approximately $62,000 or six dollars per share.

On May 15, 1961, appellant, having committed itself to the purchase of the Biltmore Terrace Hotel on Miami Beach, borrowed $94,000 from Krock, executing its note in the sum of $100,000, due six months thereafter. Griffith unsuccessfully attempted, both before and after this date, to persuade Krock to acquire an interest in the hotel. In the early part of June, 1961, Griffith had opened discussions with Krock relative to the sale of his I.& I.E. stock. From June 4 until the first week in August, 1961, Griffith was on a trip outside the continental limits of the United States. In his absence he committed to his manager, Pruitt, the responsibility of forming an opinion as to the fair and reasonable value of his I.& I.E. stock.

Between June 4, 1961 and August 11, 1961, Pruitt and Krock had conversations and correspondence about I.& I.E. stock and the price which Krock might pay for it. Hayden, Stone & Company, a New York investment banking firm, had been retained to make an independent appraisal of I.& I.E. and Serrick [4] and to recommend a fair exchange ratio for a merger of the two companies.

On June 30, 1961, Hayden, Stone & Company submitted a report, reciting that it had been retained by the manage-

---

1. Victor Muscat, Robert L. Huffines and Edward Krock, defendants below, are hereinafter referred to as appellees or by their surnames. This appeal has heretofore been dismissed as to Huffines and is presently pending as to Krock and Muscat.

2. Azalea Meats, Inc., plaintiff below, was formerly known as Southland Provision Company, a corporation. Azalea's president, Andrew D. Griffith, hereinafter referred to by his surname, is president of Azalea and for the purpose of this opinion may be considered its sole or dominant stockholder.

3. Found in 17 C.F.R. 240.10b–5, the regulation provides:
    It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
    (a) To employ any device, scheme, or artifice to defraud,
    (b) To make any untrue statement of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
    (c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
    in connection with the purchase or sale of any security.

4. Later renamed "Defiance Industries, Inc."

ment of the two corporations concerned, which in substance appraised the fair value of I.& I.E. within the range of $67.52 to $73.50 per I.& I.E. common share, thus placing a value on I.& I.E. at from 2.11 to 2.29 times the value of Serrick. Such report expressed the opinion that "a merger between the two companies effected within this range of ratios would be considered equitable."

Prior to September 8, 1961, this report was made available to appellant and was studied and understood by both Griffith and Pruitt. For example, on August 11, 1961, Pruitt wrote Krock a letter containing his analysis of such report and offering to sell appellants I.& I.E. stock at $30 per share or, in the alternative, to sell enough stock at that price to pay off appellant's note for $100,000 which Krock was holding.

After further negotiations and on September 8, 1961, appellant sold to Krock its 10,507 shares of I.& I.E. stock at $20.94 a share. Within a few days thereafter Krock either sold or transferred one-third of these shares to Muscat and one-third thereof to Huffines.

As of September 8, 1961, Muscat, Huffines and Krock controlled the stock of both Serrick and I.& I.E. and were the managing officers of both corporations. While Griffith was a nominal director of I.& I.E. he was so inactive in its affairs that Huffines stated that he had no connection with such corporation except as a stockholder.

Neither appellant nor Griffith was ever connected in any way with Serrick prior to September 8, 1961. Serrick's stock was listed on the American Stock Exchange while I.& I.E. stock was obscure, unregistered and with no ready market.

There was a spirit of mutual distrust existing between Griffith and Muscat and before appellant sold its I.& I.E. stock to Krock he had assured Griffith that none of it would be transferred to Muscat. In the course of negotiations which resulted in the sale of its stock by appellant, both Huffines and Krock had repeatedly represented to appellant that the Hayden-Stone report was worthless. Before the sale Krock had advised appellant in writing that the Hayden-Stone appraisal had been revised downward after "a million conferences" because "they wouldn't realize that the dividends from [National Bankers Life Insurance Company] are paid in one hand and repaid back to National Bankers in the other"; that the value Hayden-Stone placed on National Bankers (from which 90 per cent of the income of I.& I.E. derived) "wouldn't hold water"; that I.& I.E. had "a lot of hardships" that appellant "wouldn't know about", and that I.& I.E. "didn't even have a value of $30, much less the value in the Hayden-Stone report."

On September 8, 1961, Krock acquired all of appellant's I.& I.E. stock for $20.94 per share. On September 12, 1961, Huffines and Muscat met with the other directors of Serrick and persuaded its board to recommend to its stockholders, on the basis of the Hayden-Stone report, that Serrick pay to each I.& I.E. stockholder Serrick stock of the value of $70 for each share of I.& I.E. stock and an amendment to its charter permitting Serrick to acquire stock from its officers and directors. On June 20, 1962, the charter was so amended.

Although not entirely clear upon the record, it appears that Griffith's purported signature was affixed to a contract executed in behalf of appellant's employees' trust, which owned some 300 shares of I.& I.E. stock, to exchange such stock for Defiance stock and which apparently expressed the rate of such exchange. This was done, if done at all, less than three years before this suit was filed.[5]

Focusing its attention upon the critical dates of September 8, 1961 (the sale by appellant of its stock to Krock), and

5. Since the complaint herein was filed within three years after the purported execution of such contract, we do not digress to discuss the tantalizing question as to whether, if genuine, it constituted discovery as a matter of law.

September 29, 1964 (when the complaint was filed herein), the district court correctly decided that since 15 U.S.C.A. § 78j(b) embodies no statute of limitations, the applicable state statute of limitations governs under the Rules of Decisions Act, 28 U.S.C.A. § 1652, and proceeded to a consideration of section 95.11 of the Florida Statutes Annotated which pertinently provides as follows:

"Actions other than those for the recovery of real property can only be commenced as follows:

\*  \*  \*  \*  \*  \*

"(5) Within three years—

"(a) An action upon a liability created by statute, other than a penalty or forfeiture;

\*  \*  \*  \*  \*  \*

"(d) An action for relief on the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."

■ In a thorough opinion[6] the district court recognized that either of the two limitation periods could apply but expressed a preference for the former. Whether the present action is characterized as one upon a liability created by statute, on the one hand, or one for relief on the ground of fraud, on the other, is really immaterial for the end result would be the same. It is important, however, to note, though gratuitously, that conceptually the gravamen of an action brought under section 10(b) of the Securities Exchange Act of 1934 is fraud and that a state statute of limitations should not be permitted to narrow the filing time available under a broadly remedial federal act to a period less than the one available for commencing a similar common-law action. This we believe to be the import of the holding of the Supreme Court that: "A fundamental

purpose, common to these statutes[7], was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." G. S. E. C. v. Capital Gains Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963).

■ In determining when the clock starts runnng for the purpose of applying a borrowed state statute of limitations to a federally created remedy, federal, not state, law is controlling. It is observed in Movie-color Limited v. Eastman Kodak Co., 288 F.2d 80, 83 (2d Cir. 1961): "Similarly, a federal court will follow state decisions as to how far a cause of action must be 'complete' to have 'accrued' under state limitation statutes but will look to federal law to determine what needs be done to advance a federally created right to the level so required \* \* \*." We agree with the holding of Janigan v. Taylor, 344 F.2d 781, 784 (1st Cir. 1965): "\* \* \* that federal law must determine the date of accrual here even though the period of limitation thereafter is determined by state law."

■ Insisting upon a subjective test of actual knowledge, appellant contends that the pertinent Florida statute of limitations did not commence to run until it discovered, on September 17, 1964, the material facts upon which it relies for a recovery of damages for a fraud perpetrated by appellees.[8] This circuit, however, is committed to the more objective approach to the accrual of such an action, articulated in Goldenberg v. Bache & Co., 270 F.2d 675, 681 (5th Cir. 1959), as follows: " 'Discovery' within the meaning of the statute, 15 U.S.C.A. § 78cc(b) \* \* \* is to be determined, we think, according to an objective standard; that is, 'discovery' means either actual knowledge or notice of facts which, in the exercise of due dili-

6. Reported at 246 F.Supp. 780 (1965).

7. Including 15 U.S.C.A. § 78a et seq.

8. Appellant insists that it learned these facts from an attorney in a suit styled Norte v. Defiance Industries, Inc., Rob-

ert L. Huffines, Victor Muscat and Edward Krock, pending in the courts of New York and Massachusetts, reported in Fortune Magazine, September 1964, under the caption "What's in It for Eddie, Bob and Vic."

gence, would have led to actual knowledge of the violation."

Again, in R. J. Reynolds Tobacco Co. v. Hudson, 314 F.2d 776, 786 (5th Cir. 1963), this court wrote: "Pulling all of the loose threads together, as well as we can, we hold that prescription commenced to run from the time the disease manifested itself to the point when Hudson knew, or should have known, that the damages he sustained, which were the subject of his suit, resulted from smoking the defendant's tobacco products. When this took place is a jury question."

To this point we are in substantial agreement with the reasoning of the district court. We disagree, however, with its disposition of the issue of due diligence on motions for summary judgment.

Recognizing that, " * * * the question whether a party had sufficient opportunity, so that in the exercise of reasonable diligence he would have discovered the facts forming the basis of his cause of action, may raise issues of fact which would have to be tried to a jury; * * *", the learned judge, on the facts contained in the record before us, treated it as a question of law to be determined by the court and arrived at the ultimate conclusion that: "Considering the depositions, documents and affidavits filed herein, there can be no question that plaintiff was put on notice as to the facts constituting its alleged cause of action no later than early September, 1961." [9] We note in passing that neither of the four cases [10] relied upon by the trial court to support this result involved adjudication upon a motion for summary judgment.

The concept of due diligence is not imprisoned within the frame of a rigid standard; it is protean in application. A fraud which is flagrant and widely publicized may require the defrauded party to make immediate inquiry. On the other hand, one artfully concealed or convincingly practiced upon its victim may justify much greater inactivity. The presence of a fiduciary relationship [11] or evidence of fraudulent concealment bears heavily on the issue of due diligence.

Appropriately, we leave to the determination of the district court, after development of the facts upon a full trial, whether as a question of law to be decided by the court or as a question of facts to be submitted to the jury, Krock, Huffines, and Muscat stood in a confidential relationship to appellant and, if so, the impact which it had upon appellant's duty to exercise due diligence. Helpful guides may be found in this court's opinions in Reed v. Riddle Airlines, 266 F.2d 314 (5th Cir. 1959) and Kohler v. Jacobs, 138 F.2d 440 (5th Cir. 1943). [12]

The cases are legion which warn against the use of the summary judgment procedure provided by Rule 56 of the Federal Rules of Civil Procedure to unravel a tangled skein of facts. In National Screen Service Corp. v. Poster

9.  246 F.Supp. 780, at 784.

10.  Holland, et al. v. Pyramid Life Insurance Co. of Little Rock, 199 F.2d 926 (5th Cir. 1952); White, et al. v. Federal Deposit Insurance Corporation, 122 F.2d 770 (4th Cir. 1941), cert. denied 316 U. S. 672, 62 S.Ct. 1043, 86 L.Ed. 1747; Rosenberg v. Hano, et al., 121 F.2d 818 (3rd Cir. 1941), and Lamper v. Osius, 38 F.Supp. 373 (S.D.Fla.1941).

11.  For a full discussion of the majority rule, derived from the older cases, that the fiduciary duty owed by a director or officer extends only in favor of the corporation or its shareholders collectively and does not protect an individual stockholder in the sale or purchase of stock and the minority rule, which has the approval of "practically every legal writer in this field", that a director is a "trustee" for individual stockholders and cannot purchase their stock without first informing the individual shareholder as to any official knowledge which the director has that might affect the value of the stock, see Fletcher, Cyclopedia Corporations § 1168.1 et seq. (perm.ed. 1965).

12.  To these cases may be added Mansfield Hardwood Lumber Co. v. Johnson, 263 F.2d 748, 754 (5th Cir. 1959).

**10**

Exchange, Inc., 305 F.2d 647, 651 (5th Cir. 1962), we stated:

"Summary judgment should be granted only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is * * *. It is no part of the duty of the Court to decide factual issues, but only to determine whether there are factual issues to be tried * * *. " * * * summary judgment should not be granted if there is the 'slightest doubt' as to the facts; * * * The fact that it may be surmised that the party against whom the motion is made is unlikely to prevail at the trial is not sufficient to authorize summary judgment against him."

Of peculiar pertinence here is the language of Judge Wisdom, writing for the court in R. J. Reynolds Tobacco Co. v. Hudson, supra,

"Here, the plea of prescription raises legal issues, the applicability of which depends upon the facts. Only by developing the facts in a trial of the case can it be determined whether there is truly no genuine issue as to any material fact entitling the defendant to a judgment as a matter of law on its plea of prescription. In reaching this conclusion, we do not mean to say and we do not imply that on the state of the record before us the plaintiff's proof warrants submission of the case to the jury on the factual issues forming the basis of his opposition to the plea of prescription."

Inevitably the factual issue of due diligence involves, to some extent at least, the state of mind of the person whose conduct is to be measured against this test and it is simply not feasible to resolve such an issue on motion for summary judgment. In the landmark case of Alabama Great Southern RR. Co. v. Louisville and Nashville RR., 224 F.2d 1, 50 A.L.R.2d 1302 (5th Cir. 1955), Judge Hutcheson, as the organ of the court, wrote: " * * * where motive, intent, subjective feelings and reactions, consciousness and conscience were to be searched, an examination and cross-examination were necessary instruments in obtaining the truth, we have pointed out that and why the issues may not be disposed of on summary judgment."

■ Although appellees vigorously insist that appellant's own testimony convicted it of a lack of due diligence, nevertheless there are facts in the record, and appellant assures us there will be more, which indicate that appellant in fact relied upon misrepresentations made by appellees and that its failure to file its suit prior to September 29, 1964, resulted from these untruths rather than from a lack of due diligence on its part. To resolve the factual issue of due diligence the judgment of the district court is

Reversed.