Helen M. JENNINGS

v.

BOENNING & COMPANY and Boenning
& Scattergood, Inc.

Civ. A. No. 72–427.

United States District Court,
E. D. Pennsylvania.

Jan. 29, 1975.

Edward Fackenthal, Henderson, Wetherill & O'Hey, Norristown, Pa., for plaintiff.

L. Carter Anderson, Rawle & Henderson, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

On March 1, 1972, this "Pearlstein" doctrine case was brought by the plaintiff under the theory that the defendant brokerage house should have liquidated certain unsettled bond transactions as required by the Federal Reserve Board's Regulation "T"[1] and that the failure of the brokerage house to so liquidate resulted in losses being suffered by the plaintiff. Plaintiff now seeks to recover these losses.

1. 15 U.S.C. § 78g(c); 12 C.F.R. § 220.4(c).

Following a jury verdict placing liability on the defendant, the defendant has moved for a Judgment Notwithstanding the Verdict, contending that the action is barred by the applicable Statute of Limitations. The plaintiff has moved for a New Trial, alleging error in the Court's instruction to the jury. After carefully considering all grounds urged by both sides, the Court has granted defendant's Motion for a Judgment Notwithstanding the Verdict.

The losses complained of in this lawsuit are the culmination of approximately seven months of extremely active bond trading in the plaintiff, Helen Jennings', account with the defendant brokerage firm, Boenning and Company (Boenning). In August of 1965, the plaintiff's husband, John Jennings, was employed by Boenning as one of the firm's registered representatives. John Jennings immediately opened a "cash account" in his wife's name and began trading in the bond market. To accomplish the trading which John Jennings anticipated, he made arrangements for a clearance procedure with the American Trust Company, a bank in New York.[2] The following procedure would be pursued in purchasing the bonds. John Jennings, acting as the representative in charge of Helen Jennings' account, would place a purchase order with Boenning which would direct that the bonds were to be delivered to American Trust Company with the understanding that Boenning was to be paid immediately upon delivery of the bonds.[3] American Trust Company did not agree to loan any money to Helen Jennings or to take any risk of loss on the transaction, nor did the bank have on deposit substantial uncommitted funds belonging to the plaintiff. The American Trust Company would therefore accept the bonds from Boenning only if there were sufficient funds on hand to pay for the delivered securities. Helen Jennings would have sufficient funds on deposit with the bank only if John Jennings had sold the bonds prior to their delivery to American Trust Company and had deposited funds sufficient to cover the purchase price of the bonds. In other words, John Jennings would purchase bonds with the understanding that he would pay for them upon their delivery to the American Trust Company and he would then have to sell the bonds in the period it took Boenning to acquire physical possession of the bonds and deliver them to the American Trust Company so that he would have enough funds on deposit with the bank to cover the purchase price. If the sale price exceeded the purchase price, Helen Jennings would receive the difference as profit.

During the seven month period from August, 1965 to March, 1966, John Jennings, trading in the cash account of Helen Jennings, purchased and sold approximately seven million dollars worth of securities following generally the foregoing described procedure. The senior partner of Boenning, Harold Scattergood, made himself familiar with the trading in the Helen Jennings' account through daily reviews of the blotter and sales book.

For most of the time John Jennings was trading in the account of Helen Jennings, he was successful. However, on Feburary 18, 1966, the American Trust Company, having insufficient funds to cover the purchase price of certain Eastern Airline and Rohr bonds because the bonds had not been sold, refused to accept delivery of the bonds by Boenning for the purchase price. John Jennings had not sold the bonds because their market value had decreased from the date of the purchase order until their delivery for payment. Immediately

---

2. To arrange this clearance procedure, John Jennings used the facilities of John Lumis of Lumis & Company, a New York loan broker.

3. This is known as a "payment on delivery" account because the purchaser is not required to pay immediately upon ordering the securities, but can defer payment until he actually receives the purchased securities.

upon learning of American Trust Company's refusal to accept delivery and pay for the bonds, Harold Scattergood contacted the plaintiff, Helen Jennings, in an effort to speak with John Jennings. He finally spoke to Mr. Jennings on February 23, 1966 and was assured that arrangements would be made for either the acceptance of the bonds by the American Trust Company in New York or the payment of the loss in the account. However, neither Mr. Jennings nor the plaintiff, Helen Jennings, fulfilled these assurances and the bonds continued to decline in value. On March 1, 2 and 3, no action having been taken with respect to the bonds, Boenning sold the Eastern and Rohr bonds at a loss of over $32,000. This loss was debited to the plaintiff, Helen Jennings', account, leaving it with a negative balance.

It was plaintiff's theory at trial that the delay in selling the Eastern and Rohr bonds after the refusal of the American Trust Company to accept them for payment was a violation of the Federal Reserve Board's Regulation T and that the defendant's violation gave rise to a civil action for damages for the losses suffered between the time defendant should have sold the bonds and their actual sale. Regulation T provides in pertinent part:

#### Special Cash Account

(c) Special cash account—(1) In a special cash account, a creditor may effect for or with any customer *bona fide* cash transactions in securities in which the creditor may:

(i) Purchase any security for, or sell any security to, any customer, *Provided,* Funds sufficient for the purpose are already held in the account or the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the customer will promptly make full cash payment for the security and that the customer does not contemplate selling the security prior to making such payment.

\* \* \* \* \* \*

(2) In case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for the security within 7 days after the date on which the security is so purchased, the creditor shall, except as provided in subparagraphs (3)–(7) of this paragraph, promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof.

\* \* \* \* \* \*

(5) If the creditor, acting in good faith in accordance with subparagraph (1) of this paragraph, purchases a security for a customer, or sells a security to a customer, with the understanding that he is to deliver the security promptly to the customer, and the full cash payment to be made promptly by the customer is to be made against such delivery, the creditor may at his option treat the transaction as one to which the period applicable under subparagraph (2) of this paragraph is not the 7 days therein specified but 35 days after the date of such purchase or sale.

\* \* \* \* \* \*

(8) Unless funds sufficient for the purpose are already in the account, no security other than an exempted security shall be purchased for, or sold to, any customer in a special cash account with the creditor if any security other than an exempted security has been purchased by such customer in such an account during the preceding 90 days, and then, for any reason whatever, without having been previously paid for in full by the customer, the security has been sold in the account or delivered out to any broker or dealer: *Provided,* That an appropriate committee of a national securities exchange or a national securities association, on application of the creditor, may authorize the creditor to disregard for the purposes of this subparagraph any given instance of the type therein described if the committee is satisfied that both creditor and cus-

tomer are acting in good faith and that circumstances warrant such authorization.

It is uncontradicted that the account involved in this lawsuit was a "Special Cash Account" as that term is used in Regulation T. A Special Cash Account is one in which customer transactions are effected with the understanding that they will be settled "promptly"—that is, within the two or three days required by use of the usual transmittal facilities. Normally, when a Special Cash Account is involved in a security transaction, full payment must be made within seven full business days after the trade date or the broker/dealer must cancel or otherwise liquidate the transaction.[4] However, if the purchase arrangement is such that the broker/dealer is to be paid only upon the actual delivery of the security, full cash payment must be made promptly against such delivery or the transaction must be canceled or otherwise liquidated.[5] In this type of arrangement, where payment is to be made upon delivery, the broker/dealer must in any event be paid within 35 days of the trade date or he must cancel or liquidate the transaction.

The plaintiff relies on the case of Pearlstein v. Scudder & German, 429 F. 2d 1136 (2d Cir. 1970). The defendant, in his Motion for a Judgment Notwithstanding the Verdict, urges this Court not to follow the *Pearlstein* decision. That case held that a private cause of action arises when a broker has violated the liquidation requirement of Regulation T even though the plaintiff was familiar with the requirements of the Regulation and had knowledge of the fact that the broker was in non-compliance therewith. *See also* Spoon v. Walston & Co., Inc., 478 F.2d 246 (6th Cir. 1973), adopting the *Pearlstein* rationale. In *Pearlstein,* the plaintiff's claim arose from two bond purchases made through the defendant brokerage firm. Payment was due in full under Section (c)(2) of Regulation T within seven business days

after the date of purchase or the defendant brokerage firm was obligated to liquidate the transaction and credit any proceeds to the plaintiff's account. The defendant did not so liquidate the unpaid for transaction and the Second Circuit held that they were liable for losses thereby suffered by the plaintiff. The Court reasoned that private actions by market investors are a highly effective means of protecting the economy as a whole from margin violations by brokers and dealers and that the broker was to be the primary enforcer of the margin requirements since the federally imposed margin requirements forbid a broker to extend undue credit but do not forbid customers from accepting such credit. The Court further stated, 429 F.2d at 1140:

The defendant asserts that these cases limit investor recovery to those situations where the broker has deliberately and wilfully induced the investor to buy securities on the assurance of an unlawful extension of credit. Here, defendant submits, it was plaintiff who fraudulently induced the broker to enter into these transactions. Pearlstein was knowledgeable in the securities field, and defendant attributes to him a conscious plan to profit from the illegal extension of credit if the bonds increased in price and to sue the defendant for damages if their prices declined.

In our view, defendant's statement of the law is incorrect. The federal securities laws charge brokers and dealers with knowledge of the margin requirements and with the duty to obey them. No broker can conscientiously claim to have been mislead into extending credit beyond the seven-day limit absent some misstatement of fact by his customer regarding the customer's use of the money loaned, a circumstance which is not present here. (Citations omitted).

■ Several courts have questioned the soundness of the *Pearlstein* decision,

---

4. Section (c)(2) of Regulation T.

5. Section (c)(2) of Regulation T.

at least to the extent that it rejects the assertion of a defense by the defendant/broker based upon the subjective knowledge of the plaintiff/investor. *See e. g.,* Gordon v. DuPont Glore Forgan, Incorporated, 487 F.2d 1260 (5th Cir. 1973); Pfanensteil v. Ling & Co., Inc., 371 F.Supp. 845 (N.D.Texas, 1974); Goldman v. Bank of Commonwealth, 467 F.2d 439 (6th Cir. 1972) [6] (Dictum. In *Spoon, supra,* the Sixth Circuit apparently has accepted the proposition that a violation of Regulation T creates a private cause of action in the investor); Gammage v. Roberts, Scott & Co., Inc., CCH Fed.Sec.L.Rep. § 94,760 (S.D. Cal.1974) (decision based on other grounds). These cases seem to support the dissenting opinion of Judge Friendly in *Pearlstein* that permitting an implied right of action from Regulation T violations in cases where the plaintiff is an experienced investor "shocks the conscience and wars with common sense." Judge Friendly states as his reasoning for denying a cause of action to such plaintiffs:

> Occasional and isolated violations of Regulation T do not threaten to cause a significant alteration in the allocation of credit in the economy; only widespread or repeated violations would pose a danger. But it is in just such situations that we may confidently expect application of the administrative and criminal sanctions provided by the Act. The economic purpose behind § 7(c) thus causes the provision to differ from those portions of the securities acts more directly aimed at protection of investors . . . Any deterrent effect of

threatened liability on the broker may well be more than offset by the inducement to violations inherent in the prospect of a free ride for the customer who, under the majority's view, is placed in the enviable position of "heads-I-win tails-you-lose."[7]

While our Third Circuit in Grove v. First National Bank of Herminie, 489 F.2d 512 (3d Cir. 1973) expressly refrained from deciding whether it will apply the *Pearlstein* doctrine, this Court is of the opinion that the *Pearlstein* rationale is sound. The purpose of Section 7(c) of the Securities & Exchange Act and of Regulation T is to reduce the amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry. Among the prime purposes of the Act and the Regulation is the control of inflation, which is and has been a threat to our nation's economy. The protection of the investor is also a subsidiary but important purpose. To police this law, private actions apply a deterrent effect above and beyond threats of Governmental action by the Securities and Exchange Commission. Further, Congress determined that the most effective method of achieving its purposes was to place the onus of compliance on the brokers and the dealers and not on the investor. In order to avoid this type of lawsuit, brokers are merely required to obey the law as it is set forth in Regulation T. The Court should not be required to inquire into the subjective knowledge of each investor to determine his role in the violation, but should be required to determine only whether the

---

**6.** It should be noted that *Gordon, Pfanensteil* and *Gammage* are all factually distinguishable from this case, as well as the *Pearlstein* case. In those cases, the mathematical violation of Regulation T which led to litigation began with an inadvertent miscalculation or mistake on the part of the broker. Perhaps these cases would have been more easily decided with reference to § 6(K) of Regulation T which reads:

    If any failure to comply with this regulation results from a mistake made in good

faith in executing a transaction, recording, determining, or calculating any loan balance, market price or loan value, or other similar matter, the creditor shall not be deemed guilty of a violation of this regulation if promptly after discovery of the mistake he takes whatever action may be practicable in the circumstances to remedy the mistake.

No such circumstance exists in our case.

**7.** *Pearlstein, supra,* 429 F.2d at 1147–1148.

broker, who deals with this Regulation on a daily basis, has violated Regulation T.

The difficulty in these cases, of course, is that the investor is often no innocent "lamb" but one of substantial experience in the market. In this case, however, the evidence showed that the plaintiff, Helen Jennings, was not familiar with the requirements of Regulation T. Her husband, John, who was employed by the defendant, was an experienced trader.[8] There is no evidence in this record which would substantiate charging Helen Jennings with the bad faith displayed by her husband while trading as a registered representative for the defendant. The jury found that the defendant had not carried its burden of proving that the transaction was brought about by the fraud or deceit of Mrs. Jennings. (N.T. 3–53). We therefore determine that on the basis of the evidence in this case Helen Jennings has a private right of action as a result of Boenning's violation of Regulation T.

*Statute of Limitations.*

The defendant, in his Motion for a Judgment Notwithstanding the Verdict, without conceding that there is a private cause of action for a broker's violation of Regulation T under the evidence in this case, nevertheless contends that this action was brought after the applicable statute of limitations had run. The Court agrees.

The determination of the applicable limitations period in Regulation T cases is not entirely clear. Neither the Regulation nor the Statute under which Regulation T is promulgated contains any limitations period. One court has held that in such private actions, the limitations period of § 29(b) of the Securities Exchange Act of 1934 is applicable, 15 U.S.C. § 78cc(b),[9] that is the action must be brought within one year of discovery of the violation but not later than three years after such violation. Goldenberg v. Bache and Company, 270 F.2d 675 (5th Cir. 1959). However, the limitation provision of § 29(b) refers to actions brought to declare contracts void based upon a violation of § 78o(c) (1). That section deals exclusively with the use of the mails to effect transactions on other than a national securities exchange in which a broker uses manipulative, deceptive, or other fraudulent devices or contrivances. The lawsuit now before the Court is based upon a violation of Section 7 of the Act and Regulation T promulgated thereunder and does not involve any of the conduct enumerated under section 78o(c)(1). All the securities involved in this lawsuit were traded on a national exchange, clearly making the statute in § 78o(c)(1) inapplicable. Moreover, no Court has followed the *Goldenberg* decision and its holding has been criticised on many occasions. See Livingston v. Weis, Voisin, Cannon, Inc., 294 F.Supp. 676 (D.N.J. 1968); Pearlstein v. Scudder & German, 295 F.Supp. 1197 (S.D.N.Y.1968); 3 L. Loss, Securities Regulation 1171, n. 296. We therefore hold that the limitation period of § 29(b) does not apply in this case.

Since there is no federal limitation provision applicable to the violation of Regulation T, the Court must look to an analogous statute of limita-

---

8. In this respect, our decision is less harsh than that in *Pearlstein* where the plaintiff himself was an experienced trader.

9. Section 29(b) of the Securities and Exchange Act provides in pertinent part:
    (b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . shall be void . . . *Provided,* . . . that no contract shall be deemed to be void by reason of this subsection in any action maintained in reliance upon this subsection, by any person to or for whom any broker or dealer sells, or from or for whom any broker or dealer purchases, a security in violation of any rule or regulation prescribed pursuant to paragraph (1) of subsection (c) of section 78o of this title, unless such action is brought within one year after the discovery that such sale or purchase involves such violation and within three years after such violation.

tions in the forum state. Klein v. Bower, 421 F.2d 338 (2d Cir. 1970); Moviecolor Ltd. v. Eastman Kodak Co., 288 F. 2d 80 (2d Cir. 1961); Azalea Meats, Inc. v. Muscat, 386 F.2d 5 (5th Cir. 1967); Shapiro v. Paramount Film Distributing Corporation, 274 F.2d 743 (3d Cir. 1960). The Court, when deciding which state statute to apply must select the one which best effectuates the federal policy at issue. Hornblower & Weeks-Hemphill, Noyes v. Burchfield, 366 F.Supp. 1364 (S.D.N.Y.1973); Maine v. Leonard, 353 F.Supp. 968 (W. D.Va.1973); Gammage v. Roberts, Scott & Co., Inc., CCH Fed.Sec.L.Rep. § 94,-760 (S.D.Cal.1974). In this case the parties have agreed that, absent an appropriate federal statute of limitations, the Pennsylvania statute applicable is 12 P.S. § 31 [10] which establishes a six year statutory period from the time the action accrues.

Having found that 12 P.S. § 31 is the appropriate state statute of limitations,

we must now determine when the instant cause of action accrued and the six year limitations period began to run. Under the facts of this case, the Court ruled, and so charged the jury, that the transactions involved were controlled by section (c)(5) of Regulation T which the Court interpreted as requiring that the broker receive payment promptly upon delivery of the securities to the customer, and upon payment not being made promptly, the broker was to liquidate the bonds and credit the amount received to the customer's account.[11] The Court directed the jury that in the event the jury found the defendant liable, it should advise the Court when the defendant should have canceled the transaction and sold the securities.[12] The jury found that Boenning should have canceled the transaction and sold the securities on February 18, 1966. Defendant argues that this is the date that the plaintiff's cause of action accrued and the six year limitations period began to

10. 12 P.S. § 31 reads as follows:

All actions of trespass quare clausum fregit, all actions of detinue, trover and replevin, for taking away goods and cattle, all actions upon account and upon the case (other than such accounts as concern the trade of merchandise between merchant and merchant, their factors or servants), all actions of debt grounded upon any lending, or contract without specialty, all actions of debt, for arrearages of rent, except the proprietaries' quit-rents, and all actions of trespass, of assault, menace, battery, wounding and imprisonment, or any of them, which shall be sued or brought at any time after the five and twentieth day of April, which shall be in the year of our Lord one thousand seven hundred and thirteen, shall be commenced and sued within the time and limitation hereafter expressed, and not after; that is to say, the said actions upon the case, other than for slander, and the said actions for account, and the said actions for trespass, debt, detinue and replevin, for goods or cattle, and the said actions of trespass quare clausum fregit within three years after the said five and twentieth day of April next, or within six years next after the cause of such actions or suit, and not after. And the said actions of trespass, of assault, menace, battery, wounding, imprisonment, or any of them, within one year next after the said five

and twentieth day of April next, or within two years next after the cause of such actions or suit, and not after; and the said actions upon the case for words, within one year next after the words spoken, and not after.

11. (N.T. 3–59). The evidence did not show that this was a cash account in which the customer agreed to pay before he received the security and that the broker was therefore required to liquidate if payment was not received within seven days after the security was so purchased pursuant to (c)(2) of Regulation T. Therefore, there was no issue in the case as to whether the broker violated Regulation T by not liquidating the bond transactions after payment was not made within seven days of the purchase.

12. The Court's charge provided in pertinent part:

[I]f your verdict is for the plaintiff you must advise the Court as to each of the transactions, the Rohr and the Eastern Airlines, as to the date on which the transactions should have been cancelled by the broker or the securities sold by the broker.

If you find that the regulation was violated by the broker on more than one occasion, on more than one date, then you should, in your verdict, state as to each of the two transactions the date of the violation. (N.T. 3–55).

run, and since the instant lawsuit was not filed until March 1, 1972, it is barred by the statute. Plaintiff, however, contends that the date on which the bonds were finally sold by the defendant is the date on which the limitations period began to run.

■■ Even though the Court determines that the applicable statute of limitations is a state statute, the law is clear that a U. S. District Court must apply Federal law in determining when the clock starts running on the federally created remedy. Azalea Meats, Inc. v. Muscat, 386 F.2d 5 (5th Cir. 1967); Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965); Josef's of Palm Beach, Inc. v. Southern Investment Co., 349 F.Supp. 1057 (S.D.Fla.1972); McDonald v. Boslow, 363 F.Supp. 493 (D.Md.1973). A federal court has recently decided the precise issue as to when the limitations period begins to run on a Regulation T violation. In Gammage v. Roberts, Scott, & Co., Inc., CCH Fed.Sec.L.Rep. § 94,760 (S.D.Cal.1974), the Court stated:

> Nothing in the federal policy implemented through Regulation T persuades this Court to apply other than the general rule that the cause of action accrues when the wrongful act is committed and not at the time of its discovery.

This Court agrees with the *Gammage* decision and we hold that February 18, 1966 was the date on which the six year limitations period began to run. Therefore this action is barred by the statute of limitations.

While not controlling, Pennsylvania law is helpful in deciding this issue. The general Pennsylvania rule as stated in 22 P.L.E. Limitation of Actions § 66 provides:

> If a statute imposes a duty and gives a remedy for the failure to perform the duty, the statute of limitations begins to run on the failure to discharge the required duty.

Further in Bell v. Brady, 346 Pa. 666, 31 A.2d 547 (1943), the Pennsylvania Supreme Court held that a statutorily created cause of action accrues when one has the right to institute suit. *See also* Van Dyke v. Reich, 27 F.Supp. 436 (M.D.Pa.1939), affirmed Reich v. Van Dyke, 107 F.2d 682 (3d Cir. 1939); Antonioli v. Lehigh Coal and Navigation Company, 451 F.2d 1171 (3d Cir. 1971); Falsetti v. Local Union No. 2026, United Mine Workers, 249 F.Supp. 970 (W.D. Pa.1965).

The jury specifically found that the defendant breached its statutory duty on February 18, 1966 by not canceling the transaction and selling the bonds. The plaintiff had an immediate right to sue for the damages she suffered as a result of the defendant's breach of duty on that day. The Court finds no support for the plaintiff's contention that she was required to wait until the defendant did in fact sell the bonds before she could institute suit.[13] No evidence was presented that the plaintiff was unaware of the defendant Boenning's violation of Regulation T. Under the evidence presented in this case, the Court finds no reason to abandon the rule that the statute of limitations begins to run on the date the wrongful act is committed. The jury found that defendant Boenning violated Regulation T on February 18, 1966.

*Plaintiff's Motion for a New Trial.*

Plaintiff has moved for a new trial on the ground that the Court erred in instructing the jury that in the event it

---

13. Plaintiff has not claimed that she did not discover the Regulation T violation until a later point in time and that the statute should run from the point in time when such discovery was made. It is true that in actions based upon federally created rights where a species of fraud is present in the case, the limitations period does not begin to run until the fraud is discovered or when with due diligence should have been discov-

ered. Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946). Indeed, if this case were based upon a fraud on the part of the defendant, the date of the sale of the bonds by the broker would not begin the running of the statute of limitations. In any event, there is no evidence in this case to support any contention of fraud on the part of the defendant.

found that the defendant had violated Regulation T the jury should find the date on which the defendant should have canceled the transaction and sold the bonds. Plaintiff contends that as a matter of law the defendant Boenning should have applied the 90 day rule pursuant to section (c)(8) of Regulation T;[14] or, alternatively, it was obligated to liquidate the transactions on the seventh day following the purchases of the bonds pursuant to section (c)(2) of Regulation T.[15] If the plaintiff had proceeded to trial on either of these theories, it is of interest to note that the date of the violation of Regulation T would have occurred much earlier than February 18, 1966, and as heretofore discussed, the plaintiff's action, if any, would have clearly been barred.

■ Section (c)(8) of Regulation T sets forth the circumstances under which a special cash account becomes subject to the 90 day disqualification rule. This section places a limitation on a special cash account if a security other than an exempted security has been purchased in a special cash account and without having been paid for in full by the customer has been delivered out to any broker or dealer. Plaintiff did not advance this theory of liability in either the complaint or the pretrial order. (N.T. 3–20, 3–58). When neither the pleadings nor pretrial order advance a particular theory of liability, a party is precluded from advancing that theory at trial unless the trial court determines that the party should be permitted to advance the theory in order to prevent manifest injustice. Wiggins v. City of Philadelphia, 331 F.2d 521 (3d Cir. 1964); Kline v. Flickinger Co., 314 F.2d 464 (3d Cir. 1963); Rule 16, Fed.R.Civ. P. Plaintiff had ample opportunity to list all the theories of liability on which it would rely at trial and the exclusion of a theory advanced only prior to the court's charge to the jury did not result in "manifest injustice."

■ As to the plaintiff's contention that the Court should have charged on the seven day rule of section (c)(2) of Regulation T, the Court found that the evidence in this case clearly established that the transactions here involved were all made with the understanding that payment would be made on delivery of the bonds. Section (c)(5) of Regulation T provides that if payment is to be made promptly by the customer against delivery of the security by the broker, payment in full is not required within seven days as provided in section (c)(2), but can be extended to the time when delivery is made, but in no case exceeding 35 days from the date of purchase. The Court has reviewed the record and has concluded that the finding with respect to the seven day rule was correct.

In any event, if the Court had ruled that either the ninety day rule or the seven day rule applied to this case and had placed the time at which the defendant violated Regulation T at earlier than February 18, 1966, we would be compelled to hold that the limitations period began to run from that earlier date. Therefore, the action would be time barred.

■ Finally, the plaintiff contends that the Court erred in submitting to the jury the question of when the transaction should have been canceled and the bonds sold. It is hornbook law that in civil actions tried to a jury it is the province of the jury to decide questions of fact. It is the Court's understanding of Section (c)(5) of Regulation T, read in the context of the entire Section, that payment for a security in a pay on delivery transaction must be made promptly upon delivery of the security or else the broker must liquidate the security transaction. Therefore, the time at which a broker should liquidate is a factual issue for the jury's determination.

■ Furthermore, the failure of a party to specifically object to a jury instruction precludes that party from later claiming that such instruction was error. Mill Owners Mutual Fire Insurance Company v. Kelly, 141 F.2d 763 (8th Cir. 1944); Don Kemper Co. v.

14. See p. 6, *supra.*

15. See p. 5, *supra.*

**1304**

Beneficial Standard Life Insurance Company, 425 F.2d 221 (3d Cir. 1970). Rule 51 Fed.R.Civ.P. Plaintiff not only failed to object to the instruction that the jury determine the date on which the defendant violated Regulation T but the record shows that the plaintiff specifically agreed to the procedure. (N.T. 3–5, 3–6). For the foregoing reasons, the Court finds no error in the submission of the proper liquidation date to the jury.

Accordingly, the following Order is entered:

## ORDER

And now, this 29th day of January, 1975, it is hereby ordered that plaintiff's Motion for a New Trial is denied and defendant's Motion for a Judgment Notwithstanding the Verdict is granted and Judgment is hereby entered in favor of the defendant and against the plaintiff.