288 F.2d 784
 BANKERS LIFE AND CASUALTY COMPANY, Plaintiff,
v.
BELLANCA CORPORATION, Defendant.
BELLANCA CORPORATION, Counter-Claimant-Appellee,
v.
BANKERS LIFE AND CASUALTY COMPANY, Counter-Defendant-Appellant.
BELLANCA CORPORATION, Counter-Claimant-Appellant,
v.
BANKERS LIFE AND CASUALTY COMPANY, Counter-Defendant-Appellee.
 No. 13190.
 No. 13191.
 United States Court of Appeals Seventh Circuit.
 April 6, 1961.
 Rehearing Denied April 28, 1961.
 
 John Paul Stevens, Chicago, Ill., George N. Craig, Washington, D. C., William G. Myers, Chicago, Ill., Rothschild, Hart, Stevens & Barry, Chicago, Ill., Craig, Summers & O'Hara, Washington, D. C., of counsel, for Bellanca Corp.
 Charles F. Short, Jr., Chicago, Ill., Howard A. Brundage, Narcisse A. Brown, Chicago, Ill., Brundage & Short, Chicago, Ill., of counsel, for Bankers Life & Casualty Co.
 Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.
 CASTLE, Circuit Judge.
 
 
 1
 Bankers Life and Casualty Company[1] commenced a state court action against Bellanca Corporation[2] seeking declaratory judgment as to the ownership of 500,000 shares of common stock of Automatic Washer Company.[3] Bellanca answered and filed a counterclaim which, as amended, seeks recovery of $4,000,000.00 from Bankers for 500,000 shares of Automatic it delivered to Bankers. After amendments in the pleadings the case was removed to the District Court on grounds of diversity. Motions for summary judgment and judgment on the pleadings were denied; Bankers' complaint was dismissed on its motion; Bellanca dismissed Counts I to IV inclusive of its counterclaim; and the cause proceeded to trial without a jury on the amended counterclaim (Counts V and VI) and the amended answer thereto.
 
 
 2
 The District Court after entering findings of fact, conclusions of law, and filing a written opinion granted judgment for Bellanca on Count VI of the counterclaim in the amount of $1,250,000.00 plus interest from August 8, 1956 at 5% per annum. Both parties appealed.
 
 
 3
 Under date of May 8, 1956 Bankers and Bellanca entered into an agreement reciting Bankers' desire to purchase from Bellanca 1,112,500 shares of common stock of Automatic and Bellanca's agreement to deliver or cause Automatic to deliver an additional amount so that Bankers will own not less than 51% of the issued and outstanding shares of Automatic. In the agreement Bellanca represents it has good title to the 1,112,500 shares of Automatic and authority to sell them and to deliver or cause Automatic to deliver additional shares so that Bankers shall own at least 51% of the issued and outstanding shares of Automatic. The agreement states that Bellanca "hereby sells" and Bankers "hereby purchases" 1,112,500 shares of the common stock of Automatic for a total purchase price of $8,900,000.00 or $8.00 per share and provides that delivery by Bellanca to Bankers shall be made as follows:
 
 
 4
 "(i) 500,000 shares shall be delivered on execution of this agreement and
 
 
 5
 "(ii) 612,500 shares shall be delivered on or before such date as shall be ninety (90) days after the date of this agreement."
 
 
 6
 The contract provides that Bankers shall make payment of the purchase price by making transfers to Bellanca of stocks in four corporations which were owned by Bankers, the stocks being valued for that purpose at stated amounts. Bankers committed itself to make loans aggregating approximately $5,000,000.00 on the properties owned by the corporations whose stock was to constitute the purchase price. Any additional shares of Automatic needed to make up the 51% stock interest were to be delivered within the ninety day period at $6.75 per share.
 
 
 7
 Upon execution of the agreement Bellanca delivered the 500,000 shares of Automatic to Bankers. No further deliveries were made and upon expiration of the ninety-day period Bankers notified Bellanca by letter under date of August 8, 1956 that:
 
 
 8
 "We hereby declare said contract terminated, and affirm our election to retain the earnest deposit of stock."
 
 
 9
 The defense by Bankers to Bellanca's counterclaim for recovery for the 500,000 shares it delivered and Bankers elected to retain is grounded on Bankers' assertion that the contract of sale and Bellanca's conduct with respect thereto violated Section 16(c) of the Securities and Exchange Act, 15 U.S.C.A. § 78p(a) and (c),[4] and consequently by reason of the provisions of Section 29(b) of the Act, 15 U.S.C.A. § 78cc(b), it need not pay for the 500,000 shares.
 
 
 10
 Insofar as here pertinent § 78cc(b) provides:
 
 
 11
 "(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, * * *" (emphasis supplied).
 
 
 12
 Bankers on its appeal (No. 13190) contends that the District Court erred in not sustaining its affirmative defense both on its motion for summary judgment and on the trial of the cause, and in any event erred in the allowance of interest. Bellanca on its appeal (No. 13191) contends that its recovery should be based on the purchase price stated in the May 8, 1956 agreement ($8.00 per share) or on the market value of the stock on the date of the transfer of ownership to Bankers ($6.75 per share).
 
 
 13
 We do not deem it necessary for the purposes of this case to review the findings of fact or conclusions of law of the District Court in so far as they bear on the question of whether the agreement of May 8, 1956 or Bellanca's conduct with respect thereto constitutes a violation of either clause (1) or clause (2) of 15 U.S. C.A. § 78p(c). Under the provisions of § 78cc(b) the consequence of a violation is that the contract shall be void "as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, * * *". It is only the contract rights of the party in violation which are voided. The party in violation can not enforce his or its rights thereunder. But no rights of the party not in violation are impaired. And where, as in the instant case, the party charged with being in violation of § 78p(c) has by default in a material matter breached the contract, after having partially performed, and because of this breach is precluded from enforcing the contract against the other party, the presence or absence of a § 78p(c) violation is without material legal effect. The rights of the other party are the same in either event. The purchaser's rights are neither impaired nor regulated by § 78cc(b). That the rights of the purchaser are accompanied by correlative duties to the seller does not impinge upon the declared purpose and effect of the federal statute, where it applies, to void the contract rights of the seller.
 
 
 14
 We have considered Goldenberg v. Bache and Company, 5 Cir., 270 F.2d 675 and Kaiser-Frazer Corp. v. Otis & Co., 2 Cir., 195 F.2d 838, relied upon by Bankers. Neither case holds nor infers that § 78cc(b) permits the party not in violation to accept performance or partial performance, retain the securities delivered, without making payment. In Goldenberg the application of § 78cc(b) was not reached because the action was not commenced within the period of limitations. Kaiser-Frazer involved an attempt by the party in violation to enforce the contract. These cases do not support Bankers' position that it may retain the shares delivered without making any payment therefor.
 
 
 15
 Whether the seller's rights under the contract have been voided by § 78cc (b), or have become unenforceable because of its breach of the contract, the rights of the purchaser are to be measured by the law of the jurisdiction involved. Here the contract was made in Illinois. Bankers' election to retain the shares delivered was made in Illinois. The law of Illinois governs.
 
 
 16
 In Richards v. Shaw, 67 Ill. 222 the plaintiff had only partially performed his contract to sell and deliver 500 bushels of corn at an agreed price. The defendant urged that the plaintiff could not recover without showing completion of the contract. The court (at page 224) stated:
 
 
 17
 "It is a rule, supported by a very respectable weight of modern authority, that, if the vendee of a specific quantity of goods sold under an entire contract, receive a part thereof, and retain it after the vendor has refused to deliver the residue, this is a severance of the entirety of the contract, and the vendee becomes liable to the vendor for the price of such part; but he may reduce the vendor's claim by showing that he has sustained damage by the vendor's failure to fulfill his contract. Oxendale v. Wetherell, 9 Barn. & Cressw. 386; Shipton v. Casson, 5 ib. 378; Booth v. Tyson, 15 Vt. 515; 2 Story Con. sec. 847; 2 Parsons Con. 668, and cases cited in note; Bowker v. Hoyt, 18 Pick. [Mass.], 555.
 
 
 18
 "Although this rule may be a relaxation of the earlier and more generally received doctrine, that the entire performance, on the part of the vendor, of such a contract as the one in question, is a condition precedent to the payment of the price, and the maintenance of an action for its recovery, the rule seems to be a fair and just one, and we are disposed to give it our acquiescence."
 
 
 19
 In Oxendale v. Wetherell, 9 Barn. & Cressw. 386, 109 Eng.Rep. 143, cited by the court, the rule was laid down as follows:
 
 
 20
 "Where there is an entire contract to deliver a large quantity of goods, consisting of distinct parcels, within a specified time, and the seller delivers part, he cannot, before the expiration of that time, bring an action to recover the price of the part delivered, because the purchaser may, if the vendor fail to complete his contract, return the part delivered. But if he retain the part delivered after the seller has failed in performing his contract, the latter may recover the value of the goods which he has so delivered."
 
 
 21
 In United States for Use of Hudson River Stone Supply Co. v. Molloy, 2 Cir., 144 F. 321, 324 the court quoted Oxendale, as above, with approval and added:
 
 
 22
 "To the same effect is Bowker v. Hoyt, 18 Pick. (Mass.) 555; Richards v. Shaw, 67 Ill. 222, and cases cited.
 
 
 23
 "In Benjamin on Sales (7th Ed.) Bennett's Notes, p. 80, Mr. Bennett says:
 
 
 24
 "`With us also it has been frequently held, in conformity with Oxendale v. Wetherell, that if part of an entire order for goods is accepted and retained after or with knowledge that the whole will not be furnished, an implied contract arises to pay pro rata, subject in some courts to a counter claim for damages for noncompletion. Bowker v. Hoyt, 18 Pick. (Mass.) 555, an excellent illustration; Richards v. Shaw, 67 Ill. 222; Flanders v. Putney, 58 N.H. 358; Harralson v. Stern, 50 Ala. 347; Sentell v. Mitchell, 28 Ga. 196; Goodwin v. Merrill, 13 Wis. 658; Booth v. Tyson, 15 Vt. 518; Shaw v. Badger, 12 Serg. & R.(Pa.) 275; Rulz v. Norton, 4 Cal. 355, 60 Am.Dec. 618; Saunders v. Short, [9 Cir.], 86 Fed. 225, 30 C.C.A. 462 and cases cited.'
 
 
 25
 "Mr. R. N. Benjamin states the rule as follows:
 
 
 26
 "`It is a rule supported by the weight of modern authority, that, if the buyer of a specified quantity of goods sold under an entire contract, receive a part thereof, and retain it after the seller has refused to deliver the residue, there is a severance of the entirety of the contract, and the buyer becomes liable to the seller for the price of such part; but he may reduce the seller's claim by showing that he has sustained damage by the seller's failure to fulfill his contract.' R. N. Benjamin's Principles of Sales, p. 146, § 3, and cases cited."
 
 
 27
 In Williston on Contracts (2d Ed. 1937), Vol. 5, § 1474 at pp. 4121-4122 the following observations are made concerning the rule and the legal theories involved:
 
 
 28
 "* * * But if the deficient quantity of the goods was delivered under such circumstances that the buyer was not aware that full delivery would not be made, no new contract can be said to have been agreed to by the buyer. Here accordingly, if the seller recovers payment for what he has furnished and the buyer has not returned, it must be on the principles of quasi contract. It is true that it has often been said that a contract will not be implied by law in favor of one who is in default under an express contract, but the injustice of allowing the buyer to retain the benefits of goods without paying for them is so clear that even in England, where quasi contractual rights are generally most strictly limited, recovery has been allowed, and without the aid of a statute the weight of authority in the United States strongly supports this view.
 
 
 29
 * * * * * *
 
 
 30
 "The measure of damages in such an action is not necessarily the contract price even if the contract fixes a price by number, weight, or measure. * * * As the buyer's obligation is imposed by law, the extent of it should be restricted to the benefit which the defendant has received. * * *"
 
 
 31
 Whatever difficulties may exist in accommodating abstract and formal concepts of contract law to the formulation of the rule evolved and recognized by the cases and authority above cited, and applied in Illinois, should be resolved by the "overriding general policy, as Mr. Justice Holmes put it, `of preventing people from getting other people's property for nothing when they purport to be buying it'". Kelly v. Kosuga, 358 U.S. 516, 520-521, 79 S.Ct. 429, 432, 3 L.Ed. 2d 475.
 
 
 32
 Bankers' election to retain the 500,000 shares of stock delivered obligated it to pay for the same. Its self-serving characterization of the 500,000 shares as an "earnest deposit" is wholly without foundation either under the terms of the contract or the evidence in the record. Nor was there a provision for forfeiture or liquidated damages in event of default.
 
 
 33
 Under Count V of its counterclaim Bellanca seeks to recover $4,000,000.00 as the "contract price" of the shares delivered. Under Count VI it seeks to recover $4,000,000.00 as the "reasonable value" of the shares at the time of delivery.[5]
 
 
 34
 The District Court found the reasonable value of the stock on the date of Bankers' election to retain it, August 8, 1956, to be $2.50 per share — the lowest market value on that date. The principal sum of the judgment is computed on that basis. In our opinion the District Court did not err in measuring the recovery by such market value on the date of Bankers' election.
 
 
 35
 The $8.00 per share figure recited in the contract, and claimed by Bellanca to govern, cannot be wrested from its context. At the most, it was the price Bankers was willing to pay for 1,112,500 shares if it obtained such additional shares at $6.75 per share as would give it 51% stock ownership of Automatic and, if it could make payment for the 1,112,500 shares by transfer of stocks it owned in four other corporations at the agreed valuation. Under these contractual provisions consideration of $8.00 per share as the "contract price" would be wholly unjustified and unrealistic.[6] In addition, insofar as the market price on the date of delivery ($6.75 per share) is concerned Bellanca's default and breach, which made it impossible for Bankers to complete the contract, did not occur until August 8, 1956, when it failed to make delivery of the balance of the shares as required under the contract. Under the facts here involved we are of the opinion that the measure of Bankers' liability should be restricted to the value it received — the value of the stock at the time it exercised its election to retain it. See Williston on Contracts, § 1474, supra. It could have returned the 500,000 shares and recovered any damages it sustained by reason of Bellanca's breach. But it elected to retain the shares and it makes no claim for damages.
 
 
 36
 Whether or not a party is entitled to interest under Ill.Rev.Stat. Ch. 74, § 2 because of "unreasonable and vexatious delay" depends upon the circumstances of each particular case. People ex rel. Carpentier v. Central and Southern Truck Lines, Inc., 17 Ill.2d 120, 124, 160 N.E.2d 777. Here the value of the shares retained was readily ascertainable by reference to a generally recognized standard — the market price on August 8, 1956 — and the amount payable a simple matter of computation. Cf. Harvey v. Hamilton, 155 Ill. 377, 380, 40 N.E. 592, 593; Kelley, Maus & Co. v. Caffrey, 79 Ill.App. 278, 279.
 
 
 37
 On the record before it the District Court was justified in concluding that Bankers' refusal to pay for the shares it elected to retain was both unreasonable and vexatious. The District Court did not err in the allowance of interest on the principal amount of the judgment.
 
 
 38
 In each of the appeals (No. 13190 and No. 13191) the judgment order of the District Court is affirmed.
 
 
 39
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Counter-defendant-appellant in appeal No. 13190 and counter-defendant-appellee in appeal No. 13191. Referred to herein as Bankers
 
 
 [2]
 Counter-claimant-appellee in No. 13190 and counter-claimant-appellant in No. 13191 and known as Bellanca Aircraft Corporation at the time suit was filed. Referred to herein as Bellanca
 
 
 [3]
 Referred to herein as Automatic
 
 
 [4]
 Automatic stock was registered and traded on a national securities exchange, the Midwest Stock Exchange, and Bellanca owned more than 10% of Automatic's common stock. Bankers contends that Bellanca, an "insider", violated the first clause of § 78p(c) by selling stock neither it nor a principal for which it acted owned, and violated the second clause by failing to make delivery within twenty days. It was stipulated that on May 8, 1956, Bellanca was the beneficial owner of 900,000 shares and the District Court found that Bellanca's president owned 269,800 shares on May 8, 1956 and had authorized Bellanca to contract for the sale of the 1,112,500 shares. The District Court concluded that Bankers had failed to prove a violation of the Securities Act and in its opinion stated that in any event Bankers had no right to retain the 500,000 shares upon Bellanca's default except upon the condition that it recompense Bellanca for the reasonable value thereof
 
 
 [5]
 The market value on the date of delivery, May 10, 1956 was $6.75 per share
 
 
 [6]
 Consequently there is no "contract price" which would permit application of Ill.Rev.Stat. Ch. 121½, § 44(1), relied upon by Bellanca