## Staley v. Salvesen

*Daniel I. Murphy*, for plaintiff.
*Paul Matzko*, for defendant.

STOUT, J., March 7, 1963.—In April, May and June, 1959, Charles Gessing, who had then been in the brokerage business 33 years, was employed by Reynolds & Co., 1526 Chestnut Street, as a securities salesman. While Mr. Gessing was so employed, one John O. Salvesen opened a cash account.[1] Two transactions followed, the second of which resulted in this action of assumpsit.[2]

The second transaction began May 6, 1959. On that date Mr. Salvesen came into the Reynolds office and asked Mr. Gessing to put in an order to buy 100 shares of Haveg Industries and 100 shares of Thiokol Chemical Company at the market. He said the stock was to be delivered to the Girard Corn Exchange Bank against payment and that he would bring letters the next day authorizing delivery of the shares to Girard Corn Exchange and acceptance by Girard Corn Exchange of them.

Bills regarding purchase of the 100 shares of Haveg Industries and 100 shares of Thiokol Chemical Company were executed May 6, 1959. Settlement date was May 12, 1959. The bills indicated also that the pur-

---

[1] Gessing testified Salvesen was recommended to him by a mutual friend. His account card indicated, however, that he was introduced to sponsor (Gessing) by solicitation; that he was retired and that he lived at 1727 Vine Street.

[2] The first transaction occurred some time in April 1959 when Mr. Salvesen gave Mr. Gessing an order to sell out 100 shares of Desilu Production stock which shares were held by the Girard Corn Exchange Bank. At that time, Mr. Salvesen left two letters, one authorizing Reynolds & Co. to pick up the stock and the other authorizing Girard Corn Exchange to pay out the proceeds. This transaction was consummated satisfactorily.

chases were made for a cash account of John O. Salvesen for the net amounts of $7,271.38 (Haveg) and $7,033.64 (Thiokol). The stock was available to and under the control of the Reynolds Company the following day. Payment from Mr. Salvesen was not forthcoming.

On May 12 or 13, Mr. Gessing made inquiry of a Mr. George Purvis of Reynolds Company, who was in charge of receiving securities, letters and payments through mail, whether there was anything from Mr. Salvesen. There being nothing, both Mr. Purvis and Mr. Gessing took action. Mr. Purvis requested The Committee on Business Conduct of the Philadelphia-. Baltimore Stock Exchange to grant an "extension of 7 days on the . . . transaction recorded in a SPECIAL CASH ACCOUNT." In reply to the instruction on the extension request form to "Indicate the action taken to secure payment and describe the circumstances which made this request necessary," Mr. Purvis wrote: "Sponsor advises customer out of town. Sent debit letter." The seven-day extension was granted. It expired May 22, 1959. Through oversight, no requests for additional extensions were made. Simultaneously, Mr. Gessing was waging an unrelenting campaign, day and night, early and late, by telephone and personal visits to Mr. Salvesen's home in futile attempts to locate him. These efforts continued practically every day until June 3rd. Neither calls to nor inquiries of the Girard Corn Exchange Bank were made, however.

On June 3rd, Mr. E. J. McGuire, who then was in charge of the cash section and also of special situations of Reynolds Company, inquired of Mr. Gessing whether any attempt had been made to contact Mr. Salvesen. Upon receiving a report of the unsuccessful calls and visits, Mr. McGuire, that same day, sent a registered letter, return receipt requested, to Mr. Salveson. The

letter identified the transaction, stated that the amount of $14,305.02 plus accrued interest was due Reynolds Company and advised that unless payment was received by 2 p.m. Friday, June 5, 1959, the stock would be sold. Reynolds & Co. reserved the right, however, not to effect the sale if, at the specified time, in their discretion, it became inadvisable. They also reserved the right to effect the sale before the time specified, if, in their sole discretion, such sale should be advisable. That letter was returned "unclaimed."

On June 8, a "Second Notice" was sent in the same manner by Mr. McGuire to Mr. Salvesen. This notice was identical with the first except that the deadline for payment was set at 2 p.m., Wednesday, June 10, 1959. That letter, too, was returned "unclaimed."

On June 10, 1959, the 100 shares of Thiokol, which had been bought for $7,033.64, were sold for $5,324.20; the 100 shares of Haveg, which had been bought for $7,271.38, were sold for $6,397.71, resulting in a total net loss of $2,583.11. Plaintiffs demanded the total net loss of $2,583.11 plus $85.83, which represented 6 percent interest on $14,305.02, the total purchase price advanced from May 12, 1959, the settlement date, to June 10, 1959, the sale date. For this total of $2,668.94 plus interest suit was brought.

Salvesen's defense was plaintiff's noncompliance with section 7(c) of The Securities Exchange Act of June 6, 1934, c. 404, 48 Stat. 886, et seq., 15 U.S.C.A. §78g and Regulation T of the Board of Governors of the Federal Reserve System, 12 C. F. R. §220.4 (1937), issued pursuant thereto. However inequitable the result in this case may seem, we think plaintiff did extend credit in violation of the act and the regulation, that his contract rights were rendered void thereby and that by reason of public policy the defense must be sustained.

Section 7(c) of the Securities Exchange Act provides, in relevant part:

322

"(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer who transacts a business in securities through the medium of any such member, directly or indirectly to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

"(1) On any security (other than an exempted security) registered on a national securities exchange, in contravention of the rules and regulations which the Federal Reserve Board shall prescribe under subsections (a) and (b) of this section."

Section 7 is a prohibitory statute directed against brokers and dealers. According to the legislative history of the act, all speculative credit was subjected to the control of the Federal Reserve Board which was described as the "most experienced and best equipped credit agency of the Government." "The rules and regulations prescribed by the Federal Reserve Board must be adhered to by brokers, dealers, banks, and all other persons and corporations who extend or maintain credit for the purpose of purchasing or carrying any security registered on a national securities exchange. . . ." said The Senate Banking and Currency Committee: S. Rep. No. 1455, 73d Cong., 2d Sess. 11 (1934). The House Committee Report, 73d Cong., 2d Sess., No. 1383, revealed that, "The problem of control has been approached from several directions because of the certainty that no purpose of the bill will be more tempting to evasion." The main purpose of the bill, the House Report said, was "to give a government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry." (page 7.) "Protection of the small speculator by making it impossible for him to spread himself too

thinly," page 8, was described as a byproduct of the main purpose.

Pursuant to section 7 (c) of the act, the Federal Reserve Board promulgated Regulation T. Section 4 (c) - (1) of Regulation T provides, in summary, that in a special cash account a creditor may effect for any customer bona fide cash transactions in securities provided (1) funds sufficient for the purpose are already held in the account or (2) the purchase is in reliance upon an agreement accepted by the creditor in good faith that the customer will promptly make full cash payment. Section 4 (c) (2) provides, in summary, that in case a customer purchases a security in the special cash account and does not make full cash payment for the security within seven days after the date on which the security is purchased, the creditor shall, with certain exceptions not here relevant, *promptly* cancel or otherwise liquidate the transaction or the unsettled portion thereof.

Regulation T is mandatory in character and sales of securities to "special cash accounts" which are not met by full cash payment within the seven days prescribed by section 4 (c) (2) amount to an extension of credit in violation of the Regulation T and of section 7 (c) of the Securities Exchange Act. In the Matter of E. H. Rollins & Sons, Inc. (1945), 18 SEC 347, 386, '45-'47 CCH, Fed. Sec. Law Ser., para. 75,517. So strong is this policy against the unlawful extension and maintenance of credit that the broker or dealer cannot voluntarily accept payment after the seven day period has passed as a substitution for the cancellation or liquidation of the transaction: 26 Fed. Res. Bul. 773 (1940). And this is so even when payment is offered promptly after the period applicable to the transaction, para. 26,519.12, 2 CCH, Fed. Sec. Law Rep. (1959). Payment beyond the prescribed seven-day period cannot be accepted even where the delinquent has been pressed for payment and

where failure to apply to the Committee on Business Conduct for an extension of time was through inadvertence, In the Matter of Hogle & Co., 36 SEC 460, 464-65 (1955), or where one extension has been granted and a further extension has not been requested before expiration of the first: 25 Fed. Res. Bul. 253 (1939), 2 CCH, Fed. Sec. Law Rep., para. 26,514.

Failure strictly to abide by the credit regulations may subject the broker or dealer to many sanctions, administrative, civil and criminal. The Securities Exchange Commission may (1) revoke or deny registration of brokers or dealers under section 15(b) of the act, (2) suspend or expel them from membership in the National Association of Securities Dealers under section 15A(1), In the Matter of Coburn & Middlebrook, Inc. (1957), 37 SEC 583, '57-'61 CCH, Fed. Sec. Law Repts., para. 76,507, or (3) enjoin such violations under section 78u(e) of the act. SEC v. Young, 5 SEC Jud. Dec. 311 (N. D. Ohio, 1947). The Attorney General may bring criminal prosecution for violation of Regulation T: United States v. McDermott, 131 F. 2d 313 (7th Cir., 1942), cert. den. 318 U. S. 765 (1943).

In addition to receiving sanctions, the violator of the act and regulations thereunder may lose rights, for section 29(b) of the act [3] makes void, as to the violator, every contract either (1) made in violation, (2) performed in violation, or (3) the performance of which involves the continuance of any relationship or practice

---

[3] Section 29(b) provides, in relevant part:

"Every contract made in violation of any provision of this title or of any rule or regulation thereunder, and every contract . . . made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule or regulation, shall have made or engaged in the performance of any such contract. . . ."

in violation: Cohen v. Rothschild & Co., Inc., U. S. D. C., N. Y. (1958), '57-'61 CCH Fed. Sec. Law Rep., para. 90,849; Klein v. D. R. Comenzo Co., 207 N. Y. S. 2d 739 (1960) ; Accord, Bankers Life & Casualty Co. v. Bellanca Corp., 288 F. 2d 784 (7th Cir., 1961). Diligent research has revealed only one case with contrary result. Irving Weis & Co. v. Offenberger, 220 N. Y. S. 2d 1001 (1961), has received critical comment by Louis Loss in his 1962 Supplement to Vol. II, Securities Regulations, p. 44. Moreover, the violating broker or dealer may not assert the wrongful participation of the customer in the transaction as a defense: Remar v. Clayton Securities Corp., 81 F. Supp. 1014 (D. C. Mass., 1949).

Passing mention only need be made of plaintiff's contention that the 35-day period of section 4(c) (5) [4] and not the seven-day period of section 4(c) (2) of Regulation T is applicable. Section 4(c) (5) is designed not to give the customer additional time to make payment but rather to give the broker such leeway up to 35 days as he may need because of mechanics of the trade, unrelated to the customer's readiness to pay, to complete the transaction: Cohen v. Rothschild & Co., Inc., supra.

The transaction here involved a special cash account. Full cash payment should have been made within seven days. When payment was not forthcoming, plaintiff had the choice of requesting an extension from the Committee on Business Conduct or promptly liquidat-

---

[4] Section 4(c) (5) provides, in summary, that if a creditor purchases a security for a customer with the understanding that he is to deliver the security promptly to the customer, and the full cash payment to be made promptly by the customer is to be made against such delivery, the creditor may at his option treat the transaction as one to which the period applicable under subparagraph (2) of this paragraph is not the seven days therein specified but 35 days after the date of such purchase.

ing the account. It chose to request, and was successful in securing, one extension which expired May 22nd. No further extensions were requested of the Committee on Business Conduct. Neither was the account liquidated until June 10th. Both courses were available to plaintiff. Failure to avail itself of one or the other constituted an unlawful extension and maintenance of credit, and plaintiff cannot prevail.

That the result reached in this case seems harsh is an unfortunate circumstance. A contract which violates the laws of the United States and contravenes the public policy as expressed in those laws is unenforceable. Moreover, this is so regardless of the equities as between the parties for the very meaning of public policy is the interest of others than the parties: Kaiser-Frazer Corp. v. Otis & Co., 195 F. 2d 838 (2nd Cir., 1952).