Stanley S. PEARLSTEIN, Plaintiff,

v.

SCUDDER & GERMAN, a partnership, Defendant.

62 Civ. 1383.

United States District Court
S. D. New York.

July 24, 1968.

Aranow, Brodsky, Bohlinger, Einhorn & Dann, New York City, for plaintiff; Robert J. Ward, Martin Berlin, New York City, of counsel.

Rembar & Zolotar, New York City, for defendant; George Zolotar, New York City, of counsel.

COOPER, District Judge.

Plaintiff, Stanley Pearlstein, institutes this action to recover damages, alleging that defendant, Scudder & German, illegally extended credit to plaintiff in violation of section 7(c) of the Securities Exchange Act of 1934 (hereinafter SEA), 15 U.S.C. § 78g(c), and Regulation T issued thereunder by the Board of Governors of the Federal Reserve System, 12 C.F.R. § 220. In addition, plaintiff alleges that defendant's handling of his account constituted a fraud on plaintiff in violation of section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q (a), and sections 10(b) and 15(c) (1) of the SEA, 15 U.S.C. §§ 78j(b) and 78o(c) (1).

On February 20, 1961, plaintiff, a licensed, nonpractising attorney, opened a cash account with defendant, a partnership engaged as a broker-dealer in the securities business. On the same day plaintiff purchased through defendant 20 Richfield Oil convertible bonds for $28,-345.84 and 20 Phillips Petroleum convertible bonds for $24,163.33, a total of $52,509.17 (Ex. 1).[1] Payment for the bonds was made as follows: $42,000 was obtained from a bank loan for which the bonds were used as collateral; the remainder of the purchase price, $10,509.-17, was paid by check dated February 27, 1961 (Ex. 2).

1. "Ex." followed by a number or letter refers to an exhibit in evidence.

On March 6, 1961, plaintiff sold the Phillips bonds through defendant. Plaintiff realized $24,598.53 therefrom, of which $20,000 was used to reduce the bank loan and obtain the release of the Phillips bonds. The sum of $4,598.53 was retained in plaintiff's account with defendant. Also on March 6th, plaintiff purchased through defendant, acting as broker, 50 convertible bonds of the Lionel Corporation (hereinafter Lionel bonds). The total cost of the bonds, including accrued interest and commissions, was $59,625.41. Defendant arranged a $48,000 bank loan against the bonds (Ex. 5), leaving a balance of $7,026.88 [2] due from plaintiff. The bonds were registered on the New York Stock Exchange (hereinafter NYSE), and the delivery or settlement date was March 10, 1961.

On March 7, 1961, plaintiff purchased from defendant, as dealer, on a when-issued basis, 100 convertible bonds of the American Machine and Foundry Corporation (hereinafter AMF bonds) for $150,082.64. The bonds, registered on the NYSE, were made available for distribution on March 23, 1961. Defendant had advised plaintiff against the wisdom of both the Lionel and AMF purchases, and, with plaintiff's knowledge and consent, defendant's sale of the AMF bonds to plaintiff was a short sale.

Plaintiff entered New York Hospital on March 8, 1961 and underwent surgery on March 10th. He was discharged from the hospital on March 31st, but returned on April 9th, on an emergency basis, and underwent emergency operations on April 10th, April 13th, and April 20th. He was discharged from the hospital on June 10, 1961.

Beginning in May, 1961, defendant attempted by letters and telephone calls to secure payment from plaintiff of at least some portion of the money due on the AMF bonds. By August 7, 1961, however, plaintiff had made no payment on account thereof nor had he paid the balance due on the Lionel bonds. On Au-

gust 7, 1961, defendant sent plaintiff notice that it intended to sell the AMF bonds on August 9th unless payment was received by that date or as soon thereafter as practicable (Exs. 13, 14). Also on August 7th, plaintiff was served with a summons and complaint in an action by defendant in the Supreme Court of the State of New York, New York County, to recover $7,138.57 owing in connection with the Lionel bonds, plus interest (Ex. 15).

Plaintiff entertained doubts about the legality of the AMF transaction and had, prior to this time, consulted an attorney, Truman Luhrman. In addition, plaintiff, on August 8, 1961, made inquiry of the Securities and Exchange Commission (hereinafter SEC). NYSE and National Association of Securities Dealers (hereinafter NASD) about the AMF transaction. These interviews apparently led him to believe that there was nothing illegal about the transaction.

The next day, August 9, 1961, plaintiff executed a stipulation settling the Lionel action (Ex. 17). The stipulation called for instalment payments which were duly made. Also on August 9th, plaintiff executed an agreement with defendant relating to the AMF bonds (Ex. 16): Plaintiff agreed to pay $25,000 in cash by the close of business on August 11, 1961 and defendant agreed to extend to plaintiff a $25,000 three-month loan. In addition, defendant agreed to make efforts to obtain a $100,000 bank loan, secured by the AMF bonds. The money was paid on August 11, 1961 and the required promissory notes were executed (Exs. 18, 22, 23).

In early November, 1961, plaintiff requested, and defendant granted a three-month extension of the $25,000 loan due on November 9th. Pursuant to that agreement, defendant instituted an action on November 8, 1961 against plaintiff in the Supreme Court of the State of New York, New York County, by the service of a summons (Ex. 24), to recov-

---

2. The $7,026.88 figure represents the balance of $11,625.41 owing after the $48,000 loan, less the $4,598.53 already in plaintiff's account from the Phillips transaction.

er the $25,000. Also in pursuance of the agreement, plaintiff on November 8th signed a stipulation settling the action and agreeing to pay the $25,000 by February 8, 1962 (Ex. 25).

Plaintiff made part payment of $2,500 under the stipulation of settlement, but failed to pay the balance. Judgment was entered in the Supreme Court, February 26, 1962, against plaintiff, in accordance with the stipulation, in the sum of $22,-712.81. The amount of the judgment was subsequently paid by plaintiff. In April, 1962, shortly after the instant suit was begun, plaintiff moved in the Supreme Court (Index No. 3520/1962) to vacate the judgment. Justice Hecht, on May 1, 1962, denied the motion.

Between May 29, 1962 and April 19, 1963, the banks which held the $48,000 Lionel note and the $100,000 AMF note sold the bonds for plaintiff's account. By this action plaintiff seeks to recover damages in the amount of $59,000 on the AMF bonds and $26,466.27 on the Lionel bonds, representing the difference between the purchase price of the bonds and the price at which the banks sold them.

### Regulation T

Section 7(a) of the SEA, 15 U.S.C. § 78g(a), provides that "[f]or the purpose of preventing the excessive use of credit for the purchase or carrying of securities," the Board of Governors of the Federal Reserve System shall prescribe rules and regulations governing the extension and maintenance of credit.

Congress has additionally provided, in section 7(c) of the SEA, 15 U.S.C. § 78g (c), that:

"It shall be unlawful for any member of a national securities exchange or any broker or dealer who transacts a business in securities through the

medium of any such member, directly or indirectly to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

(1) On any security (other than an exempted security) registered on a national securities exchange, in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section."

Regulation T, 12 C.F.R. § 220, issued by the Board of Governors pursuant to section 7(a), provides, in pertinent part, that:

"In case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for the security within 7 days [3] after the date on which the security is so purchased, the creditor [4] shall, except as provided in sub-paragraphs (3)–(7) of this paragraph, promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof." 12 C. F.R. § 220.4(c) (2).

■ In addition, even if the customer were thereafter to offer full payment, the broker-dealer must not accept such payment and consider the provisions requiring cancellation or liquidation to have been met. 1940 FRB 772, noted at 2 CCH Fed.Sec.L.Rep. ¶ 22,216.16.

■ Thus the crucial date by which payment of the unpaid balance on the Lionel bonds had to be made was March 15, 1961. As of that date, however, payment had not been made. Consequently, defendant's failure to cancel or liquidate at that time constituted a violation of Regulation T and of section 7(c).[5]

---

3. "The 7-day periods specified in this paragraph refer to 7 full business days." 12 C.F.R. § 220.4(c) (7).

4. "The term 'creditor' means any member of a national securities exchange or any broker or dealer who transacts a business in securities through the medium

of any such member." 12 C.F.R. § 220.2(b).

5. It is uncontested that the bonds were non-exempt and that none of the exceptions in § 220.4(c) apply to the Lionel bonds.

With respect to the purchase of the AMF bonds on a when-issued basis, the applicable rule is stated in 12 C.F.R. § 220.4(c) (3):

"If the security when so purchased is an unissued security, the period applicable to the transaction under subparagraph (2) of this paragraph shall be 7 days after the date on which the security is made available by the issuer for delivery to purchases [sic]."

The AMF bonds became available for delivery on March 23, 1961, but no payment had been made by plaintiff as of April 4, 1961. Defendant's failure to cancel or liquidate at that time constituted a violation of Regulation T and of section 7(c).

### Private Right of Action

It is now well settled that although the SEA does not expressly give a right or remedy to a private person injured by a violation of section 7(c), such a right may nonetheless be implied. Applying the principle of 2 Restatement, Torts § 286 (1934) that where violation of a prohibitory statute has caused injury to an individual, the latter has a right of action if one of the purposes of the enactment was to protect individual interests (like the plaintiff's), the courts have held that a private right of action is to be inferred from section 7 of the SEA. Smith v. Bear, 237 F.2d 79 (2d Cir. 1956); Cooper v. North Jersey Trust Co., 226 F.Supp. 972 (S.D.N.Y.1964); Reader v. Hirsch & Co., 197 F.Supp. 111 (S.D. N.Y.1961); Remar v. Clayton Securities Corp., 81 F.Supp. 1014 (D.Mass.1949); Appel v. Levine, 85 F.Supp. 240 (S.D.N. Y.1948); see J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

A report of the House Committee on Interstate and Foreign Commerce recognizes that "[t]he main purpose" of section 7 "is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market * *." H.R.Rep. No. 1383, 73d Cong., 2d Sess. 8 (1934). However, Congress also recognized that "protection of the small speculator by making it impossible for him to, spread himself too thinly * * * will be achieved as a byproduct of the main purpose." Id. "Thus, section 7(c) does seek to protect individual investors and results in the creation of an implied statutory right." Reader v. Hirsch & Co., supra at 115.

Defendant's violation of section 7(c) and of Regulation T promulgated pursuant thereto gives plaintiff a right of action to recover from defendant any loss sustained as a proximate consequence of defendant's violation. Smith v. Bear, supra; Warshow v. H. Hentz & Co., 199 F.Supp. 581 (S.D.N.Y.1961); Remar v. Clayton Securities Corp., supra.[6] However, in view of our determination that plaintiff's rights under the SEA and the applicable regulations were

---

6. Although we agree with defendant's contention that the proof fails to show that defendant induced plaintiff to purchase the Lionel and AMF bonds in violation of Regulation T, we reject defendant's conclusion that the absence of inducement negates the existence of a private right of action. The fact that there was no agreement at the inception of the purchase contracts that plaintiff need not pay for the bonds within the prescribed 7-day periods surely cannot destroy an investor's rights—especially when those rights mature only after the broker-dealer has failed to liquidate or cancel in a timely fashion and has caused injury to the investor. A contrary conclusion would render illusory the remedies created for investors by Congress. But see E. F. Hutton & Co. v. Weinberg, CCH Fed.Sec.L.Rep. ¶ 91,332 (Sup.Ct.1964); Irving Weis &. Co. v. Offenberger, 31 Misc.2d 628, 220 N.Y.S.2d 1001 (N.Y.City Mun.Ct.1961) (characterized by Professor Loss as a "confused opinion in which [the] court referred to Regulation T as 'a rule of an exchange' * * *" 2 L.Loss, Securities Regulation 1264 n. 75 (Supp. 1962). It is to be noted that there is no implied right of action under a rule of an exchange. See Colonial Realty Corp. v. Bache & Co., 358 F.2d 178 (2d Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966)).

extinguished by his settlements of two New York State Supreme Court actions involving the Lionel and AMF bonds, we do not decide the extent to which plaintiff has suffered damages proximately caused by defendant's violation.

### Stipulations of Settlement

■ It is our view that when the parties entered into the stipulations of August 9, 1961 and November 8, 1961 (Exs. 17, 25), settling the suits brought by defendant for sums due on the Lionel and AMF purchases respectively, they in effect removed all controversy surrounding the legality of the purchases and substituted valid and binding settlements which effectively bar recovery in this action. These stipulations superseded the existing controversies between the parties and constituted new agreements entitled to be enforced without regard to the validity of the original claims or defenses thereto. Yonkers Fur Dressing Co., Inc. v. Royal Insurance Co., Ltd., 247 N.Y. 435, 160 N.E. 778 (1928); American Progressive Health Insurance Co. v. Chartier, 6 A.D.2d 579, 180 N.Y.S. 2d 181 (1st Dept. 1958). The claims made by plaintiff in this action could have been advanced in the state court actions, as was done by the customer of a broker-dealer in Billings Associates, Inc. v. Bashaw, 27 A.D.2d 124, 276 N.Y.S.2d 446 (4th Dept. 1967). Having chosen, instead, to settle the actions, plaintiff is foreclosed from litigating the issues here.

As we find no merit to plaintiff's objections to the binding effect of these settlements, we find them to be valid, enforceable, and dispositive of the instant case.

Section 29(a) of the SEA, 15 U.S.C. § 78cc(a) provides:

"Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."

Although plaintiff, in his Post-Trial Memorandum, does not pursue the contention, raised in his Amended and Supplemental Complaint, ¶ 21, that the stipulation of settlement entered on November 8, 1961 with respect to the AMF transaction was illegal and invalid in that it violated the above-quoted section,[7] we have examined, in view of the broad formulation of the settlement issue in the Pre-Trial Order,[8] both the AMF and Lionel stipulations in the light of section 29(a).

■ Section 29(a) has been judicially construed to preclude only those waivers of SEA provisions and rules and regulations thereunder made prior to the existence of a controversy. It does not prevent or invalidate stipulations settling controversies already in existence or actions already instituted. See Wilko v. Swan, 346 U.S. 427, 438, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (concurring opinion); Moran v. Paine, Webber, Jackson & Curtis, 389 F.2d 242 (3d Cir. 1968), aff'g 279 F.Supp. 573 (W.D.Pa.1967); Reader v. Hirsch & Co., supra; Moran v. Paine, Webber, Jackson & Curtis, 422 Pa. 66, 220 A.2d 624 (1966).

■ In view of the fact that the settlements were entered into after the commencement of state court actions, plaintiff's contention that the stipulations did not settle any actual controversy between the parties lacks merit. Further, the proof reveals that although plaintiff, prior to August 9, 1961, had disputed liability, questioned the validity of the transactions, paid visits to the SEC, NYSE, and NASD, and spoken with an attorney, he expressed a desire to settle "the two claims" (Transcript p. 291). In addition, when plaintiff signed the stipulation of settlement of November 8,

---

7. No such allegation was made in the Amended and Supplemental Complaint with respect to the stipulation of settlement of August 9, 1961 involving payment for the Lionel bonds.

8. "Were the stipulations of settlement entered into between plaintiff and defendant in actions in the Supreme Court of the State of New York valid and enforceable and do they bar recovery in this action?" Pre-Trial Order, ¶ 8(4).

1961, he knew that defendant had received a letter from the SEC about the AMF transaction as to which he still owed $25,000. It is therefore apparent that plaintiff did settle with defendant actual controversies involving the Lionel and AMF purchases, and that such settlements do not violate section 29(a).

Plaintiff further contends that the stipulations of settlement of the state court actions are void in view of section 29(b) of the SEA, 15 U.S.C. § 78cc(b), which provides in pertinent part:

> "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract * * * the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract * * * *"

It is plaintiff's argument that in view of section 7(c)'s ban on the maintenance of credit in violation of Regulation T, the stipulations of settlement, as agreements continuing illegal credit, violate the above-quoted language of section 29(b) and are therefore void. This contention lacks merit and fails to diminish the binding force of the settlements.

■ Plaintiff recognizes that a contract within the purview of section 29(b) "cannot possibly be considered absolutely and totally void." Greater Iowa Corp. v. McLendon, 378 F.2d 783, 792 (8th Cir. 1967). Rather, it is only the contract rights of the party in violation of the statute which are voided. The contract rights of the party not in violation are in no way impaired, and the innocent party may enforce the contract if he so desires. Id.; see, e. g., Bankers Life and Casualty Co. v. Bellanca Corp., 288

F.2d 784 (7th Cir.), cert. denied, 368 U. S. 827, 82 S.Ct. 47, 7 L.Ed.2d 31 (1961).

■ Applying this standard to the facts before us, the most we can say for plaintiff's argument is that the performance of the original purchase agreements involved the continuance of a relationship in violation of Regulation T, in that defendant failed to cancel or liquidate upon plaintiff's non-payment within the prescribed period.[9] Even assuming that such an arrangement was voidable at plaintiff's option, the execution of the stipulations created an entirely new relationship between the parties. Rather than continue illegal credit, the stipulations represented the intention of the parties to make "a fresh start." Yonkers Fur Dressing Co., Inc. v. Royal Insurance Co., Ltd., 247 N.Y. at 444, 160 N.E. at 781. Whatever illegality inhered in their relations prior to the execution of the stipulations of settlement was submerged by the mutual creation of a new contractual relationship. By the terms of the stipulations, provisions were made for payment on account of earlier purchases. To say that the stipulations were themselves void and that such settlements can now be set aside runs counter to the general policy in favor of the settlement of existing disputes. The thrust of plaintiff's argument on this point seemingly leads to the untenable result that it would never be possible to settle issues arising from violations of the credit and margin regulations and that all such controversies would have to be litigated. This would impose a wholly unreasonable requirement not intended by Congress.

■ In further assault on the stipulation of August 9, 1961 settling the Lionel action, and also on the agreement of August 9, 1961 (Ex. 16) providing for terms of payment for the AMF bonds, plaintiff alleges (Amended and Supplemental Complaint, ¶¶ 18, 33) that these agreements were coerced by defendant and are therefore voidable.[10] In support

9. Contra, Billings Associates, Inc. v. Bashaw, supra.

10. The Amended and Supplemental Complaint contains no allegation of coercion with respect to the stipulation of settlement of November 8, 1961.

of his contention, plaintiff presented two expert witnesses who treated him during the relevant period: Dr. Melvin Fishman, a psychologist, and Dr. Jack Richard, an internist.[11] While we credit so much of their testimony which establishes that from March, 1961 onward plaintiff was agitated, depressed and anxious, we are not impressed with their conclusions that plaintiff's judgment was so impaired that he was unable to represent himself adequately. Even less convincing, in our estimation, was the testimony of plaintiff himself dealing with his alleged susceptibility to coercion. It is our view, in the light of plaintiff's extensive market experience as well as the testimony of Messrs. Scudder and Zolotar relating to their dealings with plaintiff during 1961, that plaintiff, intent on retaining the Lionel and AMF bonds, rationally acted of his own volition and voluntarily entered into the agreements of August, 1961 as well as the stipulation of November 8, 1961. Whatever emotional problems plaintiff may have had are insufficient to invalidate transactions with laymen who had no reason to doubt his rationality.

### Res Judicata

▆▆ Although the stipulations of settlement are dispositive of the instant litigation, we note also that the judgment entered on the settlement of the AMF action in the New York Supreme Court is res judicata and bars relitigation in this court of all matters which were or could have been raised in the state court action instituted by defendant. See, e. g., Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 378, 60 S.Ct. 317, 84 L.Ed. 329 (1940).

▆▆ It has been held by this court that a judgment entered upon a settlement, as here, is to be given res judicata effect although the facts were not litigated at trial. In Stuyvesant Insurance Co. v. Dean Construction Co., 254 F. Supp. 102 (S.D.N.Y.1966), aff'd per curiam, 382 F.2d 991 (2d Cir. 1967), Judge Bryan stated:

"There is no doubt that a judgment entered upon a settlement is res judicata as to all questions which were or could have been litigated in the action in which the judgment was entered. [citing cases] * * *

* * * * * *

" * * * Thus the judgment * * * entered on the settlement operates as a bar * * * and 'prevents relitigation of all grounds for, or defenses to, recovery that were then available to the parties before the particular court rendering the judgment, in relation to the same claim—regardless of whether all grounds for recovery or defenses were judicially determined.' 1B Moore, Federal Practice ¶ 0.405, at 622 (2d ed. 1965) * * *.

"It is immaterial that the settlement entered into was improvident or that * * * rights to raise constitutional and other questions in the state litigation were unwisely relinquished or abandoned. Res judicata guards against such hindsight as was displayed here. The principle of res judicata, particularly appropriate in these proceedings, 'seeks to bring litigation to an end and promote certainty in legal relations.' United States v. Munsingwear, Inc., 340 U.S. 36, 38, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950)" Id. at 110, 111.

---

11. Defendant renews its motion, made during trial, to strike in toto the testimony of Dr. Fishman. We sustain its admissibility for the reasons set forth in open court (Transcript p. 126). Defendant also renews its motions to strike the opinion evidence of Drs. Fishman and Richard with regard to plaintiff's ability to engage in transactions in issue in this case. In view of the relationship between these expert witnesses and plaintiff and their consequent personal knowledge of his condition, we deny defendant's motions and sustain admissibility. See Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637, 643, 644 (1962).

■ In order for the prior judgment to have res judicata effect in the instant litigation, the two actions must be "upon the same claim or demand." Saylor v. Lindsley, 391 F.2d 965, 968 (2d Cir. 1968). That requirement is satisfied here, as the prior action was instituted by defendant in the course of collection of payment for the AMF bonds, and the judgment entered in the case resolved the payment issue on the basis of plaintiff's affirmance of the transaction and payment for the bonds. The stipulation settling the action specifically recited plaintiff's affirmation "that he has no defense to this action." (Ex. 25, ¶ 1). We find that the instant litigation, in which plaintiff seeks to undo the AMF purchase, is based on the same claim which was the subject of the state court action and that we are thus barred from reopening in this forum the prior litigation. Although § 27 of the SEA, 15 U.S.C. § 78aa, confers exclusive jurisdiction on the federal courts to hear actions arising under the Act, plaintiff could have raised his section 7 and Regulation T arguments as defenses in the state court action. See, e. g., Billings Associates, Inc. v. Bashaw, supra; Remington Rand Inc. v. International Business Machines Corp., 167 Misc. 108, 3 N.Y.S.2d 515 (Sup.Ct. 1937).

Subsequent to the entry of judgment on February 26, 1962, plaintiff did in fact move in the New York State Supreme Court to set aside the judgment, alleging that defendant had violated section 7 of the SEA and Regulation T in the purchase of the AMF bonds. Defendant opposed the motion by affidavits, and while it was pending, plaintiff commenced the instant action. In his decision denying the motion on May 1, 1962, Justice Hecht

expressly decided that: " * * * The defendant [Stanley Pearlstein] has submitted no substantial reason to set aside the judgment. His remedy is by way of the independent action which he states has been commenced in the federal court. * * *." [12] (Transcript p. 365).

Accordingly, it is our view that plaintiff, faced with the choice of contesting the suit against him by raising defenses based on defendant's alleged violation of the SEA or settling the action and retaining the bonds, opted for the latter course and thereby waived the right to litigate the questions raised in this action.

There is no merit to plaintiff's contention that the judgment is subject to attack because plaintiff settled the state court action while under the mistaken belief that he had to pay for the bonds. There is no evidence whatsoever that Mr. Zolotar misrepresented the state of the law to plaintiff, and, as we pointed out earlier, plaintiff himself was an attorney and experienced trader, and had consulted another attorney prior to the execution of the agreements of August, 1961. The proof reveals that plaintiff wanted to keep the bonds and voluntarily agreed to do so, not that he was fraudulently induced into so doing.

■ Likewise we see no reason for altering our disposition of the res judicata issue because of the omission from the affidavits submitted by defendant and its attorney to the New York State Supreme Court (in opposition to plaintiff's motion to set aside the judgment of February 26, 1962) of the fact that a representative of the SEC had informed defendant that it had apparently violated Regulation T in its handling of the AMF

---

12. We do not construe the latter sentence as reflecting any belief by Justice Hecht that the state courts are without power to consider a defense that a cause of action does not lie by reason of a violation of a federal statute. Nor do we interpret it as expressing a view that Pearlstein might be successful in this court. Rather, it would appear that Justice Hecht, without expressing any

opinion as to the probability of success of a federal court action or as to the validity of any claim or defense that might be raised there, meant to convey that the state court judgment was not subject to attack on the proffered grounds and that Pearlstein's only opportunity for relief lay in his federal court action.

transaction (Ex. 30).[13] Justice Hecht was not bound by the contents of that letter, and he rendered his decision upon a record in which both parties argued the Regulation T issue. Although Justice Hecht made no express ruling on whether or not defendant did violate Regulation T, the existence of Exhibit 30 could have had no binding effect had he chosen to rule on the question.

### Anti-Fraud Provisions

One aspect of plaintiff's contention that defendant violated the anti-fraud provisions of the Securities Act of 1933 and the SEA, 15 U.S.C. §§ 77q(a), 78j (b), and 78o(c) (1), is that defendant, by failing to cover the short sale of the AMF bonds to plaintiff as soon as the bonds became available on March 23, 1961, was in a position to speculate against plaintiff without putting up its own money. As authority for this proposition plaintiff cites SEC Release No. 34–6778, Reg. § 241.6778 (April 16, 1962), 2 CCH Fed.Sec.L.Rep. ¶¶ 22, 696–698, which states, in essence, that in any transaction between a broker-dealer and his customer, there is an implied representation by the broker that, in accord with reasonable trade custom, the transaction will be consummated promptly unless there is a clear understanding to the contrary.

We find the contention unimpressive, for plaintiff has utterly failed to adduce any convincing proof which even suggests that defendant's conduct was fraudulent in any respect. Rather, the record reveals that defendant secured plaintiff's permission to sell short to him, and that as of March 23, 1961, plaintiff had not yet made payment for the AMF bonds. There is no indication that defendant acted in any manner as to the short sale other than in accord with normal trade custom. Moreover, plaintiff does not dispute defendant's interpretation of Release No. 34–6778 as applying only to short sale situations in which the broker-dealer has received payment from his customer. We find that whatever irregularity might have inhered in the AMF transaction from the standpoint of Regulation T did not constitute a fraud.

Similarly, there is no merit to plaintiff's allegation that defendant violated the anti-fraud provisions by its use of economic pressure and misrepresentation that plaintiff was liable for losses thereby coercing plaintiff into taking the AMF bonds in August, 1961. We have already touched on this issue in our discussion of the stipulations of settlement and the res judicata defense. It is sufficient here to repeat only that there is no evidence that defendant or its attorney misrepresented the state of the law to plaintiff, and that we are satisfied that plaintiff acted voluntarily throughout the period in question.

### Statute of Limitations

Defendant's contention that plaintiff's action is time barred is without merit. As to the allegation of fraud resulting from a violation of a rule or regulation prescribed pursuant to § 15(c) (1) of the SEA, 15 U.S.C. § 78o(c) (1), to which the one-year statute of limitations contained in section 29(b) of the SEA, 15 U.S.C. § 78cc(b) applies, we find that even assuming defendant guilty of fraudulent practices, plaintiff's action would not be time barred. The action was commenced on April 5, 1962, less than one year after any possible fraud was, or by the exercise of due diligence could have been discovered. See Goldenberg v. Bache & Co., 270 F.2d 675 (5th Cir. 1959).

Defendant, relying on *Goldenberg,* argues that plaintiff's claim based on section 7 of the SEA and Regulation T promulgated thereunder is also barred by the one-year statute of limitations

13. Defendant renews its motion, made at trial, to strike the correspondence between defendant and an SEC representative (Exs. 28, 29, 30). We adhere to our ruling that these exhibits are admissible, not for the truth of the matters contained therein but to show the existence of correspondence between defendant and the SEC and on the issue of the credibility of defendant's witnesses.

contained in section 29(b). The short answer to this contention is that the one-year limitation in section 29(b) is expressly limited to actions based on "violation of any rule or regulation prescribed pursuant to paragraph (1) of subsection (c) of section 78o of this title * * *" 15 U.S.C. § 78cc(b), and does not affect actions brought under section 7 and Regulation T.[14]

Defendant's motion to dismiss the action is granted. Judgment for defendant.

The foregoing shall constitute this Court's Findings of Fact and Conclusions of Law, pursuant to Rule 52, F.R.Civ.P.

So ordered.

---

14. Professor Loss comments as follows with regard to this issue:

"In Goldenberg v. Bache & Co., 270 F.2d 675, 680 (5th Cir. 1959), the court erroneously applied this [one-year] statute of limitations to a customer's damage action against her broker for violation of Regulation T, . . . presumably because the plaintiff had attempted to make a violation of § 15(c) (1) out of the case." 3 L.Loss, Securities Regulation 1771 n. 296.