Mitchell A. ABOUSSIE, Plaintiff-Appellant,

v.

Tanal A. ABOUSSIE and Camal A. Aboussie, Defendants-Appellees.

No. 29616.

United States Court of Appeals, Fifth Circuit.

April 1, 1971.

Rehearing Granted June 24, 1971.

Lonny D. Morrison, Robert K. Pace, Jack Banner, Wichita Falls, Tex., for appellant, Mitchell A. Aboussie; Sherrill, Pace & Rogers, Wichita Falls, Tex., of counsel.

Milton Zacharias, Wichita, Kan., Clyde Fillmore, Wichita Falls, Tex., for appellees; Fillmore, Lambert, Farabee & Purtle, Wichita Falls, Tex., of counsel.

Before COLEMAN, AINSWORTH and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

Appellant and his two brothers, the appellees, were the sole stockholders of Aboussie Brothers Audio Visual System, Inc., each owning 100,000 shares. The company was incorporated in Kansas, where the two appellees resided and where it had its principal office. Appellant resided in Texas. After considerable quarrelling among themselves, and lengthy negotiations, appellant (Seller), on October 13, 1966, in Texas, signed a formal written agreement, prepared by his attorney and earlier signed by the appellees (Buyers) in Kansas. The document stated that Seller was transferring his stock to Buyers in consideration of payment of 75 cents a share, or a total consideration of $75,000, payable as follows: $38,000 cash, transfer to Seller of a company automobile (valued by the parties at $2,500), and assumption by the corporation of two notes of Seller to a bank totalling $34,500. Also the Buyers agreed to secure release of Seller from his personal liability on notes of the corporation to a bank; this undertaking on their part was not assigned any value by the agreement.

On the same day, also in Texas, the Seller transferred his stock, and the Buyers delivered to him the recited consideration (with one amendment) plus certain other cash payments, discussed below, that had been agreed on extrinsically to the written instrument. For several weeks prior to October 13 the Buyers, with the knowledge of Seller, had been negotiating for a sale of the corporation to Sylvania Commercial Electronics Corporation, a much larger company. The Buyers had represented to

Sylvania that they would be able to deliver all the stock of Aboussie Brothers. Within a few weeks after October 13, the Buyers reached an agreement with Sylvania, which was closed out in early 1967 by a sale to it of all the corporate assets. Buyers then liquidated Aboussie Brothers, and received therefrom $541,051.14, from which they paid expenses in connection with the sale, producing a net amount per share of stock substantially in excess of the 75 cents per share paid to Seller.

Seller sued the Buyers in the United States District Court for the Northern District of Texas, asserting two claims: that the Buyers breached a contract with him to pay to him one-third of the net proceeds of the sale to Sylvania less $75,000, and that they violated Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated pursuant to § 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j.

At trial the jury answered special interrogatories as follows:

SPECIAL ISSUE No. 1

Do you find from a preponderance of the evidence that in connection with the sale of Plaintiff's stock in Aboussie Brothers Audio-Visual Systems, Inc. to Defendants, the Defendants or either of them or any representative of the Defendants engaged in any of the following activities:

(a) Employed any device, scheme or artifice to defraud Plaintiff;

Answer "yes" or "no" Answer: Yes

(b) Made any untrue statements of a material fact to Plaintiff:

Answer "yes" or "no" Answer: Yes

(c) Omitted to state a material fact to Plaintiff necessary in order to make the statements made to Plaintiff, in light of the circumstances under which they were made, not misleading:

Answer "yes" or "no" Answer: Yes

(d) Engaged in any act, practice or course of business which operated as a fraud or deceit upon the Plaintiff?

Answer "yes" or "no" Answer: Yes

SPECIAL ISSUE No. 2

Do you find from a preponderance of the evidence that in engaging in any of the activities listed in Special Issue No. 1, if you have so found, the Defendants or either of them or their representative directly or indirectly made use of any means or instrumentality of interstate commerce or the mails?

Answer "yes" or "no" Answer: Yes

SPECIAL ISSUE No. 3

Do you find from a preponderance of the evidence that Plaintiff discovered that Defendants had engaged in any of the activities set out in Special Issue No. 1, prior to October 13, 1966?

Answer "yes" or "no" Answer: Yes

SPECIAL ISSUE No. 4

From a preponderance of the evidence, what sum of money, if any, if paid now in cash, would reasonably and fairly compensate Plaintiff for the damages, if any, which he has sustained by reason of Defendants' purchase of his stock?

Answer in dollars, if any, and cents, if any. Answer: $67,017.04

SPECIAL ISSUE No. 5

Do you find from a preponderance of the evidence that in connection with the purchase by Defendants of Plaintiff's stock an agreement was reached either before or after October 13, 1966 entitling Plaintiff to receive one-third of the proceeds from the sale of the corporate stock of Aboussie Brothers Audio-Visual Systems, Inc. to Sylvania Commercial Electronics Corporation less the $75,000.00 paid by Defendants to Plaintiff?

Answer "yes" or "no" Answer: Yes

SPECIAL ISSUE No. 6

What net sum, if any, in dollars and cents, do you find from a preponderance of the evidence was received and will be received by Defendants from

the sale of Aboussie Brothers Audio-Visual Systems, Inc. to Sylvania and including the proceeds received in liquidation of Aboussie Brothers Audio-Visual Systems, Inc.?

Answer in dollars, if any, and cents, if any. Answer: $541,051.14

The District Court granted the motion of defendants for judgment n/o/v, on the sole ground that "[t]he Court finds that, as a matter of law, no consideration existed for the agreement mentioned in Special Issue No. 5." The Court's order did not mention the 10b–5 claim.

### 1. The contract claim

■ The order granting the defendants' motion for judgment n/o/v states only that no consideration existed for the agreement to divide profits. The trial judge may have thought that there had to be consideration for that agreement independent of the Seller's written undertaking to sell his stock. Or, the judge may have thought that, although the consideration for the extrinsic agreement to divide profits [1] could be the written promise of Seller to transfer his stock, there was insufficient evidence for the jury to conclude that such written promise actually was the consideration. Under either hypothesis the District Court erred.

It now has been established that in connection with the Buyers' purchase of the Seller's stock there was a tripartite agreement, consisting of the formal written agreement, extrinsic agreements concerning Seller's claims for back salary and expenses, and the extrinsic agreement to divide the profits on the Sylvania sale.

Execution of the formal written agreement is not disputed. As to the extrinsic agreements concerning salary and expenses, the exhibits before us reveal that prior to October 13 the Seller wrote the Buyers that he would sell his stock only if he was paid $5,000 which he claimed as back salary and which the corporation denied owing him, and $430.31 expenses incurred by him on behalf of the corporation. These items were not mentioned in the formal instrument. When the attorney for Buyers closed the transaction on October 13, he delivered releases from the bank on the personal and corporate notes, title to the car, a cashier's check for $28,000 plus a promissory note of the Buyers for $10,000 (these in lieu of the $38,000 cash agreed), all of these being the items covered by the written agreement. But at the same time he also delivered checks for the $5,000 salary claim and the $430.31 expenses. The attorney secured one receipt from Seller for all items.

Turning to the agreement to split the profits of the Sylvania sale, whether that agreement was made is not a question at this juncture. The jury found that it *was* made.[1A]

---

1. As best we can tell from the minimal appendix before us, see footnote 1–A, *infra*, the extrinsic agreement to divide profits was either wholly oral or partly oral and partly written. The necessity of determining whether a document is an integration of all understandings of the parties exists whether the extrinsic negotiations and understandings are oral, or written, or partly oral and partly written. 3 Corbin, Contracts, § 573. However, this matter usually arises in the context of the so called "parol evidence rule," *i. e.*, where the extrinsic understandings are oral. For simplicity, we refer at times to the matter in terms of extrinsic oral dealings.

1A. The appellees argue that there was insufficient evidence to support that finding. They have not made the transcript of testimony a part of the skeletonized Appendix. However, the exhibits are before us. They contain a letter of September 1, 1966 from T. A. Aboussie, (usually the spokesman for the Buyers), stating that he and his brother accept the offer of Seller to sell for $75,000. That letter discusses various other matters which became incidents of the formal document of October 13. It also discusses the claims for salary and expenses. That letter says:

"I would like to report that we are in the process of negotiating with the General Telephone and Telegraph and their subsidiary firm, Sylvania, for the sale to them of Aboussie Bro stock in exchange for G T & E stock. This firm sent its

**154**

■ This is not an instance of parties totally integrating into one written instrument all of their agreements on the subject matter and assenting to that document as the full and complete statement of everything that they have agreed upon. *See* 3 Corbin, Contracts, § 573; 4 Williston, Contracts, (3d ed.) § 633. Extrinsic evidence was, of course, admissible to make the threshold determination of whether the formal agreement was the total agreement or less than all of what had been agreed upon, 3 Corbin, Contracts, §§ 573, 582, 583. The fact that it was not the total agreement is established by the jury finding that the profit splitting agreement was made and the undisputed evidence of the extrinsic agreements concerning salary and expenses.

■ Parties can make their contracts in such forms as they see fit,[2]

and if they wish they can reduce some agreements to writing and leave others to oral expression and still others to partially oral and partially written form. A written agreement, though not a complete integration, may be the complete statement of certain things that have been negotiated out and agreed upon— the so-called "partial integration."[3] But in this instance it is undisputed that the formal agreement was not an all-inclusive statement of the obligations to which the Buyers were committing themselves in consideration for Seller's transfer of his stock, because in addition to what they agreed to do on the face of the paper the Buyers agreed also to pay $5,000 salary and $430.31 expenses (and actually paid these amounts as part of the same closing transactions.)

■ Of course, there can be separate agreements touching the same gen-

---

acquisition team to Wichita Thursday and these people were greatly impressed. They indicated before they left that they would purchase our firm for approximately $1,500,000.00 in their stock and invited TAA to Boston to conclude negotiations. * * *

"If I succeed in Boston in Selling to G T & E for a figure of about 1½ million we will owe 5% commission of the 1st 1 Mil and 20% commission of all over 1 mil to the Thomas Investment Co. who is responsible for the negotiations. I am asking for 10% of the deal off the top, *and you and Kay and me will split over $1.2 mil. Your share will be about $400,000.00"* (Emphasis added.)

In a letter of March 25, 1968 to Seller, the same writer said this:

"1. *Money.* With regard to this item you have told Mom and others that your brothers made millions and kicked you out penniless. As I promised, I am enclosing for your edification the "purchase price adjustment" sheet as mailed to me on February 17, 1967. (You know that this would have been available to you anytime you had asked me for it). This sheet reflects that Kay and I netted $273,114. Out of this sum we paid out the following approximate amounts:

| | |
|---|---:|
| Note & Loans for M. A. A. stock | 82,500 |
| Corporate Income Tax | 41,000 |
| Balance of corporate bills not current | 44,000 |
| | $167,500 |
| Commission to Thomas | 30,000 |
| | $197,500 |

We divided the balance 60% for me, 40% for Kay. I paid 1966 tax increase (copy mailed to you) of $17,000 and owe 1967 of approximately 20,000.

So, Mitchell, *although I would love to have sent you additional sums,* you have done so well you might even consider sending me back some dough. *I did indeed mean it when I told Henry* [a mutual friend] *that I would send you a share of the profits had there been some* and you know in your heart that this is true. We kept these figures to ourselves (nobody else's business) and no one knows how we fared." (Emphasis added.)

2. Subject, of course, to considerations of the statutes of frauds, or other statutes imposing standards for the form of the contract. The parties make no contention that any such statutes are involved. See Vernon's Tex.Code Ann.Bus. & C. § 8.319.

3. However, as Professor Corbin points out, where it is shown that the parties have contracted partly orally and partly in writing, it is risky to conclude that a "partial integration" as represented by the writing is conclusive as to anything. 3 Corbin, Contracts, § 581 at p. 441.

eral subject matter, one or more written and one or more oral, each supported by independent consideration.[4] 3 Corbin, Contracts, § 594 at p. 567; 4 Williston, Contracts (3d ed.) § 637. The "separate consideration" arrangement is carried forward into § 240(1) (a) of the Restatement of Contracts. Our discussion does not imply that there was separate consideration in this case—we do not know what all the evidence was on that issue—but we do know that independent consideration is not necessarily a prerequisite to enforcement of an extrinsic oral agreement. An oral promise is enforceable under many circumstances without any consideration other than that to be found for the promises made in the writing, and the separate oral agreement need not exist independently as a valid separate contract. These are the cases described in Restatement of Contracts § 240(1) (b). *See also*: 3 Corbin, Contracts, § 584 at pp. 478–480 and n. 96; 4 Williston, Contracts (3d ed.). §§ 637–638.

■ In a host of cases Texas has recognized the enforceability of an oral promise extrinsic to the face of a written instrument,[5] which instrument is less than a full and complete integration of the entire transaction, with the sole consideration emanating from the promisee of the oral commitment being that which he promised in the written instrument.[6] The stated reasons for enforcing the oral promise vary. In some instances it is said that the oral promise was made as an inducement to the promisee thereof to enter into the written contract;[7] in others that the oral promise was "collateral" to the written agreement, which is the same test of that of the Restatement § 240(b)[8] in others that the written agreement was executed by the parties in part performance of their undertakings under a more comprehensive and entire oral agreement,[9] and in still others there are combinations of one or more of these articulations.

The cases are numerous, the types of written contracts differ, and the nature of the oral representations vary. We refer to only a selected number. West Texas Util. Co. v. Ellis, 102 S.W.2d 234 (Tex.Civ.App.), rev'd on other grounds, 133 Tex. 104, 126 S.W.2d 13 (1939), oral agreement of corporation, extrinsic to stock subscription and stock certificate, to buy stock back from subscriber on demand; Smith v. Pulliam, Inc., 388 S.W. 2d 329 (Tex.Civ.App.1965), written building contract, builder permitted to recover for partial performance on his proof that he left job when owner breached oral agreement to secure a loan commitment for funds to pay for job; Heflin, Inc. v. Texas Oceanic S.S. Co., 53 S.W.2d 133 (Tex.Civ.App.1932), shipper under written carriage of goods contract may sue for breach by steamship company of oral commitment to

---

4. In such a case, unless the evidence shows that the separate agreements, taken together, constitute a total integration of everything that has been agreed upon, it is open to the parties to show by evidence extrinsic to the agreements themselves that performance of one or more of the separate agreements was a condition to the performance of one or more of the others. 3 Corbin, Contracts, § 584 at p. 478.

5. While the cases often are expressed in evidentiary terms—of the admissibility of the extrinsic evidence—they reflect the nature of the so-called parol evidence rule as a substantive principle of contracts law.

6. The parties have briefed only Texas law and assume that it governs. Since the Texas conflict of laws rule is that it will apply the law of the state expressly or by implication agreed upon by contracting parties to govern, we follow the lead of the contracting parties at this juncture. Grace v. Orkin Exterminating Co., 255 S.W.2d 279, 296 (Tex.Civ.App.1953). If a different choice of law is appropriate, we have insufficient data before us on which to make it.

7. *See* 23 Tex.Jur.2d § 358.

8. *See* 23 Tex.Jur.2d § 356; Hubacek v. Ennis State Bank, 159 Tex. 166, 317 S.W. 2d 30 (1958).

9. *E. g.*, Landrum v. Stewart, 111 S.W. 769 (Tex.Civ.App.1908); Peel v. Giesen, 21 Tex.Civ.App. 334, 51 S.W. 44 (1899).

comply with "sole discharge clause" (i. e., providing that ship would not carry like goods to same destination on same voyage); Callaway v. Albin, 114 Tex. 5, 261 S.W. 372 (Tex.Com.App.1924), oral statements by defendant inducing plaintiff to enter arbitration agreement; New York Life Ins. Co. v. Thomas, 47 Tex.Civ.App. 149, 104 S.W. 1074 (1907), Denver resident employed under written contract for employment in New Jersey permitted to recover on oral agreement to pay his moving expenses to New Jersey; Blair v. Slosson, 27 Tex.Civ.App. 403, 66 S.W. 112 (1901), contract for fixed real estate commission, agent allowed to recover on oral promise of principal to pay more if deal was satisfactory.[10]

■■■■ A motion for judgment n/o/v may be granted only when, without weighing credibility, and viewing the evidence most favorably to the party securing the jury verdict, there may be only one reasonable conclusion. Powell v. Lititz Mutual Ins. Co., 419 F.2d 62 (5th Cir. 1969). If, rather than thinking independent consideration was required, the District Court considered that there was insufficient evidence to support a finding that Seller's written promise was consideration for the Buyers' promise to divide profits of the sale to Sylvania, granting the motion still was error. Even on the limited evidentiary matter available to us, and under Texas law, there is adequate evidence for a finding that

Seller's promise to sell his stock was consideration for the promise to divide profits.

### 2. The 10b–5 claim

By Special Issue Nos. 1 and 2 the jury found in connection with the sale of Seller's stock to Buyers one or both of the Buyers or their representative had committed various acts, through use of interstate commerce or the mails, which would give rise to liability under § 10b–5. By answer to Special Issue No. 4, the jury fixed damages of $67,017.04.

■■■■ The Buyers assert that the 10b–5 claim, filed October 14, 1968, a Monday, was barred by limitations. A 10b–5 action is governed by the state statute of limitations, but federal, not state, law determines when the statutory period commences, Azalea Meats, Inc. v. Muscat, 386 F.2d 5 (5th Cir. 1967); Hooper v. Mountain States Securities Corp., 282 F. 2d 195 (5th Cir. 1960), and in this Circuit the clock begins to run when the plaintiff has actual knowledge or notice of facts which in the exercise of due diligence would have led to actual knowledge. *Azalea Meats, supra.* Both parties apply the two-year Texas statute for fraud, misrepresentation or deceit. Vernon's Tex.Stat.Ann. § 5526.[11]

The parties assume that the order granting judgment n/o/v to the defendants, though silent as to the 10b–5 claim, had the effect of sustaining as a matter of law defendants' contention that the

---

10. Separate oral agreements have been readily enforced where the written agreement is a negotiable instrument and no holder in due course is involved: Hansen v. Yturria, 48 S.W. 795 (Tex.Civ.App. 1898), maker successfully defended on contemporaneous oral agreement by payee to furnish funds for business enterprise from profits of which note would be paid; Hubacek v. Ennis State Bank, 159 Tex. 166, 317 S.W.2d 30 (1958), automobile dealer permitted to claim a credit against note on which he was sued, based on oral agreement of bank to set up reserve account of 2% of his notes paid in full and apply against notes not paid; Edens v. Duncan, 331 S.W.2d 810 (Tex.Civ. App.1959), maker of note given for con-

struction of new house given credit thereon based on oral agreement by builder to accept old house as part payment; Lee v. First Nat'l Bank, 254 S.W. 394 (Tex. Civ.App.1923), reversed because defendant surety on note was denied opportunity to prove oral representations by maker and payee as to use of proceeds and by payee that he would exhaust other security before calling on surety.

11. See Azalea Meats, Inc. v. Muscat, 386 F.2d 5 at 8 (5th Cir. 1967) (dictum) characterizing the gravamen of a 10b–5 suit as fraud. *Compare* Vanderboom v. Sexton, 422 F.2d 1233 (8th Cir. 1970), applying the limitations period of the Arkansas Blue Sky Law.

limitations period had expired, and they join battle on the meaning of Issue No. 3, whether it means that prior to October 13 defendants had *engaged* in the activities referred to, or that prior to October 13 the plaintiff had *discovered* that defendants had engaged in the activities. Appellant objected to the interrogatory, pointing out the ambiguity, but his objection was overruled. On what is before us, we see no way in which to resolve this difference in interpretation with any confidence that we are correctly determining what it was that the jury had in mind.

If it develops that October 13, 1966 was the critical date on which the statute began running, a suit filed on Monday, October 14, 1968 would not be barred by the Texas two-year statute. Rule 6, Fed.R.Civ.P.; Union National Bank of Wichita, Kan. v. Lamb, 337 U.S. 38, 69 S.Ct. 911, 93 L.Ed. 1190 (1949).

### 3. Disposition

The case must be reversed and remanded to the District Court. As to the contract claim, the judgment n/o/v having been erroneously granted, the plaintiff is entitled to entry of judgment on the jury verdict. As to the 10b–5 claim, for the reasons stated above, the judgment n/o/v must be vacated, but the case is not in a posture in which judgment may be entered for plaintiff. If he desires it, plaintiff is entitled to a new trial on the 10b–5 claim subject to the following caveat. Once compensatory damages for breach of contract are awarded by the judgment entered on the contract claim, plaintiff may, or may not, claim that there is a hiatus of compensatory damages assertible under the 10b–5 claim and not extinguished by the contract award, and if he claims that hiatus it may, or may not, survive summary judgment. Also, plaintiff may, or may not, claim exemplary damages under 10b–5.

If he does, the District Court must determine whether exemplary damages are allowable in a 10b–5 action. The Second Circuit has held that they are not.[12] The Fifth Circuit has not ruled on the matter. We decline to commit this Circuit by what might be no more than an advisory opinion on what may be an abstract question, which has been neither considered nor briefed by the parties.

Reversed and remanded for further proceedings not inconsistent with this opinion.

---

12. Globus v. Law Research Service, Inc. 418 F.2d 1276 (2d Cir.), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); Green v. Wolf Corp., 406 F.2d 291 (2d Cir.), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1968). *But see* comment, Punitive Damages for Securities Regulation, 8 Hous.L.Rev. 137 (1970).